## Richmond

SUTTLE MOTOR CORPORATION V. CITIZENS BANK OF POQUOSON, NOW THE FIRST VIRGINIA BANK OF THE PENINSULA.

January 16, 1976.

Record No. 741248.

Present, Carrico, Harrison, Cochran, Poff and Compton, JJ.

*Harry J. Kostel; Richard S. Gordon (Jones, Blechman, Woltz & Kelly,* on brief), for plaintiff in error.

*James E. Bradberry (Robert E. Scott; Moore, Weaver, Moore & Bradberry,* on brief), for defendant in error.

HARRISON, J., delivered the opinion of the court.

Suttle Motor Corporation sought to recover a judgment against Citizens Bank of Poquoson, now the First Virginia Bank of the Peninsula, for $10,800, the amount it allegedly lost by reason of the manner in which the bank handled two drafts which it accepted from Suttle for collection. Appellant alleged that Poquoson held the drafts for an unreasonable length of time without collecting, giving notice of dishonor, or returning them. Suttle prosecutes this appeal from an adverse ruling by the lower court.

Suttle, an established automobile dealer in Newport News, sold many used cars to Batts and Hockaday Motors, Inc. (Batts), a used car dealer in the same city. When purchasing a used car, Batts would execute an envelope-type documentary draft, drawn on Poquoson and payable to the order of Suttle, for the purchase price. Suttle would insert therein an executed title certificate to the vehicle and deposit the draft in the United Virginia Bank/Citizens and Marine, in Newport News. This bank would give Suttle credit, and would forward the draft to its correspondent bank, United Virginia Bank/State Planters, in Richmond. State Planters would give Citizens and Marine credit and forward the draft to Poquoson for collection. Upon payment of the draft, Poquoson would deliver the title to Batts, or to its assignee, and remit the amount to State Planters.

On October 18, 1972, Suttle received a documentary draft from Batts drawn on Poquoson for $6,800, representing the purchase by Batts of a 1972 Cadillac automobile. This draft, with title attached, was deposited by Suttle to its account at Citizens and Marine and was received for collection on October 30, 1972, by Poquoson from State Planters. On November 14, 1972, Suttle received a documentary draft from Batts drawn on Poquoson for $4,000, representing the purchase by Batts of a 1972 Pontiac automobile. This draft, with title attached, was also deposited by Suttle in Citizens and Marine and was received for collection by Poquoson from State Planters on November 30, 1972. In each instance the model and make of the automobile were set forth on the face of the draft.

The Pontiac vehicle was sold by Batts to one Maceo Jones. The Poquoson bank financed the purchase. Jones and wife gave Poquoson their note, with Batts as comaker, for $5,336.52, secured by a deed of trust on the automobile. *Title to the car was not delivered or transferred to Jones.* On November 17, 1972, Poquoson credited the purchase price of the car, $4,100, to the Batts account. The draft it gave Suttle for $4,000 was not then in the bank.

On December 12, 1972, Batts sold the Cadillac automobile to Lillie D. Harrell. Poquoson financed the purchase, taking from Harrell her note, with Batts as comaker, for $8,752.80, secured by a deed of trust on the automobile. *Again there was no title delivery or transfer to the purchaser.* On December 20, 1972, Poquoson credited the purchase price of the car, $6,350, to the account of Batts. The Suttle draft for $6,800 was not paid.

Officers of Poquoson testified that two or three times a week they reviewed with Batts the company's documentary drafts, at which

time Batts would designate those that were to be paid. No time limit was established by the bank as a maximum for holding drafts, and its policy was to hold them indefinitely in the absence of payment or instruction to return. Poquoson's defense to appellant's action is that it was never authorized by Batts to pay the Suttle drafts or to return them, and therefore it was under no duty to have returned the drafts or to have advised State Planters of their status.

N. C. Whitehead, Jr., Manager of Batts, testified that customarily when Poquoson financed an automobile being sold by Batts, and had in its possession a documentary draft from Batts with the title to the automobile attached, the title would be detached from the draft and delivered to the buyer. Simultaneously, the amount due on the draft would be paid from the proceeds of the loan made the buyer of the car. Payment would be accomplished by crediting Batts' account with the purchase price and debiting its account with the amount of the draft. Poquoson would remit the amount of the debit to State Planters. Whitehead said he assumed that this practice would be followed when the Pontiac and Cadillac cars were sold. However, he testified that the bank debited Batts' account for other obligations which the company owed, instead of paying the Suttle drafts. Thus, he claims that the bank retired debts due it by Batts with money that properly and rightfully should have gone to pay the Suttle drafts.

Donald Sweeney, President of Batts, explaining why the $6,800 draft for the Cadillac was not paid, said: "The reason it wasn't picked up is because Mr. Riggins [Senior Vice President of Poquoson] had informed Mr. Forrest [Assistant Vice President of Poquoson] to pay off certain delinquent accounts [of Batts] and they were using all the funds in the bank for paying off the accounts and not paying the draft. So, therefore, they had taken the deal [financing Harrell's purchase of the Cadillac] and were denying us the opportunity, by taking our money away, to pick up the draft and pay Suttle Motor Corporation for the car."

The drafts, when sent to Poquoson by State Planters, were not accompanied by a collection letter, and the payor bank received no instructions from the intermediary bank as to the manner in which the drafts should be handled. We therefore determine whether Poquoson complied with its statutory duties relating to the collection of documentary drafts.

Code § 8.4-501 provides that:

"A bank which takes a documentary draft for collection must present or send the draft and accompanying documents for present-

ment and upon learning that the draft has not been paid or accepted in due course must seasonably notify its customer of such fact even though it may have discounted or bought the draft or extended credit available for withdrawal as of right. (1964, c. 219)"

Code § 8.4-503 provides that a bank presenting a documentary draft:

"[U]pon dishonor, either in the case of presentment for acceptance or presentment for payment . . . *must use diligence and good faith to ascertain the reason for dishonor, must notify its transferor of the dishonor and of the results of its efforts to ascertain the reasons therefor and must request instructions . . .*". [Emphasis supplied]

The custom followed by banks in handling documentary drafts is not uniform. And the time permitted for their payment or return varies. What is seasonable time, and what is due diligence and good faith, must necessarily depend upon the facts and circumstances of each case. The cashier of Citizens and Marine testified that while the policy of his bank was ten days without specific instructions, under certain circumstances, depending on the customer, an unpaid draft would be retained for a month before being returned. A representative of State Planters testified that she sent the draft involved to Poquoson for collection without specific instructions. She said that if drafts are not cleared, she sends tracers every ten days and then follows up the tracers with telephone calls. She also said that while thirty days in which to pay or return a draft was not "an absolute cutoff", she would not go too much over thirty days if she could help it.

The day Poquoson received the $6,800 draft there was a balance of $87.57 in the Batts checking account. The account showed a balance of $122.48 on November 30, 1972, when the $4,000 draft arrived. Poquoson retained one draft for over sixty days and the other for over thirty days before returning them to State Planters. To determine whether this constitutes an unreasonable or unseasonable time we must look to the surrounding facts and circumstances.

Batts and Hockaday Motors was at one time a valued customer of Poquoson. The volume of its business with the bank was so great that the bank maintained a separate ledger, or "customer's draft book", just for Batts. This book reflects that from August 7, 1972, through December 26, 1972, Poquoson received 202 drafts drawn by Batts. Of these, 182, totaling in excess of $500,000, were paid. The other

20, totaling approximately $60,000, were returned, and of these it appears at least 13 were returned at the time the Batts account was closed. Poquoson would normally retain drafts drawn by Batts in an uncollected status anywhere from one day to forty-two days. Drafts were usually paid within fifteen days after receipt.

Poquoson was financing a large number of automobiles for Batts and its customers. It has been noted that Whitehead and Sweeney attributed the failure of the bank to pay the Suttle drafts to its actions in charging Batts with certain items owed the bank by the company, instead of paying the drafts. Specifically, when the Cadillac automobile was financed and Batts' account was credited with $6,350, the account was debited by payment of items which reduced its balance to $1,443.96. Clearly the proceeds from the loan to Harrell should have been applied in payment of the Suttle draft, thereby enabling Harrell to obtain good title to her automobile.

On December 12th, Poquoson had two documents in its possession which reflected that title to the car being financed for Harrell could not be delivered except upon payment of the Suttle draft for $6,800. One document was the customer's draft book and the other was the draft itself. Both documents showed the make and model of the vehicle involved. Further, on December 20th, the date the transaction was apparently closed, Poquoson had only one draft from Batts covering a 1972 Cadillac convertible, and that was the draft payable to Suttle. Mr. Forrest, on behalf of the bank, and in his own handwriting, had listed this draft in his draft book. He described in detail the bank, dealer, amount, etc. involved, and showed the automobile to be " '72 Cad. Conv."

Poquoson contends that it did not have knowledge, and was not charged with knowledge, of the titles enclosed in the Suttle drafts. However, by the middle of December, 1972, Batts and Hockaday Motors was in serious financial difficulties which involved Poquoson. Conferences were held between officials of Poquoson and Batts seeking a solution. The bank had financed the Jones purchase of the Pontiac vehicle, and the purchaser of the car was demanding a title thereto. It is therefore incredible that at the time of the transaction involving the Cadillac automobile one or more officers of the bank did not have knowledge of the Suttle $6,800 draft, which reposed in the bank's files. By then the bank knew, or should have known, that it had previously financed for Jones a Pontiac automobile which occupied the same status as the Cadillac. Further, it would appear that Batts' disintegrating financial condition, together with the pat-

tern of Batts' past and current dealing with Poquoson, should have alerted the bank to the improbability that this used car company owned the two vehicles free of liens.

In spite of this mid-December, 1972 activity, and the financial straits of Batts, Poquoson still did not return the drafts to State Planters, advise State Planters of their status, or seek any instructions. In fact the drafts were not returned until after Batts and Hockaday had closed its account at Poquoson. The return must have been made some time in early January for State Planters did not debit Citizens and Marine's account the amount of the drafts until January 10, 1973. The drafts were not returned to Citizens and Marine until January 22, 1973, when they were subsequently charged to Suttle's account.

Counsel for Poquoson contends that the drafts were subject neither to presentment nor to dishonor, and admits that Poquoson "never made demand for payment from Batts and Hockaday nor was appellee obligated to make demand for payment". He argues that Poquoson's "only obligation was to await authorization for payment from Batts and Hockaday and, prior to payment, to await and obey any instructions, if any, received from the forwarding bank, State Planters". We disagree.

The bank's role in the handling of a documentary draft is not such a passive one as Poquoson would have us believe. Its duties and obligations are delineated by statute. The Suttle drafts were sent "for collection", and the statute requires a presentation. It is contemplated that the draft will either be accepted and paid or that payment will be refused and the draft dishonored. In either event, the presenting bank has to act reasonably and seasonably and has to use diligence and good faith. Where indicated, it must notify the transferor of the draft of its nonpayment, or of a delay in payment, and the reasons therefor. Under the Official Comment to Code § 8.4-501, it is observed that "to the customer the draft normally represents an underlying commercial transaction, and if that is not going through as planned he should know it promptly".

Michael Suttle, Jr. testified that the reason for the use of a draft with title attached was "to insure payment", and to be assured that the purchaser would not get title to the car sold until he had paid the purchase money, which was evidenced by the draft. When Suttle deposited the drafts in Citizens and Marine, he had no reason to believe that he was assuming any risk. He had a right to expect that when the drafts reached Poquoson they would be handled regularly

and according to law; that Poquoson would effect collection and deliver the titles; that if it could not collect within a reasonable time, it would advise. Most certainly Suttle could not have anticipated that the drafts would remain outstanding and unpaid until January, 1973; that during that time the cars in question, represented by titles attached to his drafts, would be sold, encumbered and delivered to third parties; and that Poquoson would lend its aid to such a course of action by financing the sales without requiring any evidence of title to the vehicles, and without payment of drafts which contained the very titles involved, a fact shown by the records of the bank.

We do not have here a mere delay in the return of a draft. There was delay and inaction at a critical time when Poquoson was making a tremendous effort in its own behalf to reduce the losses which it obviously faced on the Batts and Hockaday account.[1] Had the drafts been returned even as late as mid-December, 1972, Suttle could also have taken steps to minimize the loss it stood to suffer by reason of the course of action followed by Poquoson and Batts. Poquoson not only placed itself in an untenable position with Jones and Harrell, it brought about a conflict of interest between the bank and Suttle, and this condition existed until the drafts were returned.

The case of *Wiley, Tate and Irby* v. *People's Bank and Trust Co. of Tupelo, Miss.*, 11 UCC Rep. Serv. 154 (N. D. Miss. 1971), *aff'd*, 462 F. 2d 179 (5 Cir. 1972), is in point. The facts in *Wiley* are almost identical with the facts in the instant case with the exception that the intermediary bank there forwarded the drafts to the payor bank with instructions to "deliver documents only on payment of drafts attached. Return all unpaid items immediately". The payor bank, after determining that payment could not be made due to insufficient funds, held the drafts for periods ranging from 12 to 113 days without payment or without notice of nonpayment to the intermediary or forwarding bank. The court held that the payor bank had not complied with its duty under a Mississippi Uniform Commercial Code provision, similar to Virginia's, to seasonably present the draft and upon dishonor to notify its customer. It noted that after having determined that payment could not be made because of insufficient

---

[1] During November and December, 1972, the bank debited the account of Batts and Hockaday on several occasions and in substantial amounts. This was done to pay certain delinquent accounts due the bank by various parties for which Batts was responsible as endorser or accommodation maker. Debits were also made to cover checks given Batts by some of its customers, which were deposited in the bank, and later returned because of insufficient funds. By January 3, 1973, the checking account of Batts and Hockaday was overdrawn in the amount of $59,296.98.

funds, the bank did not return the drafts or notify the intermediary bank that the item had not been paid, and that this was a clear violation of the statute (referring to a section similar to Code § 8.4-503). The defendant in *Wiley* made a number of the same defenses asserted here. The court held, however, that:

> "Payor Bank did not have any direct contact with plaintiff in regard to the collection of the items. Payor Bank's contacts were with the Intermediary Bank. Plaintiff did not say or do anything inconsistent with the position that Payor Bank should handle the items in accordance with the instructions from the Intermediary Bank *and with statutory provisions.* [Emphasis supplied]
>
> "Payor Bank owed plaintiff the duty of handling the items in accordance with instructions from the Intermediary Bank, in the light of statutory provisions, and nothing more. Payor Bank was under no duty to plaintiff to do anything but present the items to Houston for payment, and, in default of payment, promptly return the items and give notice of non-payment. Instead of performing this duty Payor Bank held the items for an unreasonable and unseasonable length of time to accommodate its own customer.
>
> "It is the opinion of the court that the uncontradicted facts in the action require that Payor Bank suffer the consequences of its own dereliction of duty. . . ." 11 UCC Rep. Serv. 161-62.

The duties generally of a bank which accepts a draft for collection are set forth in 9 C. J. S. Banks and Banking § 235, pp. 488, 489, 490, as follows:

> "A bank which undertakes to collect paper is bound to keep within the authority conferred upon it. If a special contract for the collection has been entered into, or particular instructions have been given, these must be followed. The ordinary duty of a bank which receives paper for collection is to make a proper presentation and demand for payment, and to take such further action as is necessary to secure and preserve the liabilities of all parties as may be required by the governing law. Ultimately the bank must either return the paper or account for the amount of its proceeds. The collecting bank must act in good faith, exercise reasonable skill in performing its duties, and use due care and diligence in making prompt presentment, demand, and protest, in giving notice of dishonor, and in taking whatever steps are necessary to protect its customers' rights, or it will be liable for loss.

\* \* \* \* \*

"A bank is given wide discretionary powers in the execution of the collection. It is an implied part of the contract that proper methods of collection shall be used and a collecting bank fails in its duty where it adopts a method which is not proper and feasible, . . .

\* \* \* \* \*

"Due diligence on the part of the collecting bank must be measured in the light of the surrounding circumstances, and if the person from whom the collection is made is in doubtful or failing financial condition it should inform its principal at once and due diligence may require that some extra effort toward collection be made. . . ." [Footnotes omitted]

It is our conclusion that Poquoson failed to comply with the duties imposed upon it by statute, and that appellant was damaged by reason thereof. Appellee's liability is fixed by Virginia Code § 8.4-302 (b), and the amount appellant is entitled to recover is not an issue.

The judgment of the lower court is reversed, and this case is remanded for the entry of a judgment for appellant consistent with the views herein expressed.

*Reversed and remanded.*