The UNION BANK OF BENTON, ARKANSAS, Plaintiff-Appellant,

v.

The FIRST NATIONAL BANK IN MT. PLEASANT, TEXAS, Defendant-Appellee.

No. 78–3342.

United States Court of Appeals, Fifth Circuit.

July 18, 1980.

Ted Boswell, David E. Smith, Bryant, Ark., for plaintiff-appellant.

Norman C. Russell, Texarkana, Tex., Robert Rolston, Mount Pleasant, Tex., for defendant-appellee.

Before RUBIN and POLITZ, Circuit Judges, and SMITH *, District Judge.

POLITZ, Circuit Judge:

Collapse of a scheme to "float" or "kite" drafts occasions our examination of the Uniform Commercial Code (U.C.C.) which is enacted in Texas as the Tex. Bus. & Com. Code Ann. tit. I (Vernon 1968) (hereinafter "BCC"). We must determine upon whom the mantle of financial responsibility settles. Pursuant to submission on stipulated facts and documentary filings, the district court found that all losses should be borne by The Union Bank of Benton, Arkansas. We affirm in part, reverse in part and remand.

## PART I

In the fall of 1975, Bob Barr of Atlanta, Texas, Freddie Newcomb of Benton, Arkansas, and Kenneth Williams of Mt. Pleasant, Texas, structured a documentary draft kiting scheme based on the auto auction business. Under the plan, Barr would draw drafts on Newcomb's account at Union Bank of Benton, Arkansas ("Benton"). Newcomb would then draw drafts on Williams' account at First National Bank in Mt. Pleasant, Texas ("Mt. Pleasant"). Ostensibly, these drafts were to cover the purchases of automobiles, first by Newcomb from Barr, and then by Williams from Newcomb. Bogus documents of title cover-

* District Judge of the Northern District of Mississippi, sitting by designation.

ing non-existent vehicles were sent along with the drafts. As relates to the drafts before us, no cars were sold or intended to be sold. The only thing to be "purchased" was time; time for Barr's actual sale of vehicles to generate funds for Williams' use in covering the drafts at Mt. Pleasant.

As part of the camouflage, the phoney drafts were mixed in with genuine instruments. Believing all drafts submitted were valid, Benton "honored" them immediately, thus extending credit in that amount to Newcomb. When the scheme was uncovered, each bank, relying on different BCC provisions, sought to shift responsibility for the loss to the other. Finding that Mt. Pleasant had performed as required by the BCC, the district court assigned the total financial loss to Benton.

The focal point of this dispute is that piece of the scenario in which Newcomb drew drafts on Williams' account at Mt. Pleasant. During the early stages of the scheme, Mt. Pleasant presented the drafts to Williams who paid them with funds supplied by Barr. Mt. Pleasant then transmitted the funds to Benton which, having already credited Newcomb's account with the drafts, retained the proceeds.

By December, 1975, the financial house of cards began to tumble. Barr was unable to deliver the funds Williams needed to cover drafts that were accumulating at Mt. Pleasant. Following established pattern and practice, Benton continued to send Mt. Pleasant documentary drafts on Williams' account. Twenty-four drafts, totaling $70,-175 were received by Mt. Pleasant between December 15, 1975 and January 5, 1976. Accompanying each draft was a "collection letter" containing these instructions: (1) pay at par, (2) do not protest or wire nonpayment unless otherwise instructed, (3) do not hold for convenience of drawee unless otherwise instructed, (4) deliver documents attached only on payment of draft. The directive "pay or return within 24 hours" was stamped on the collection letters and on some of the drafts.

These 24 drafts were returned to Benton, as one unit, on January 7, 1976. Attached to the unpaid drafts was an unsigned notation stating "cannot pay salvage titles."

On January 10, 1976, prior to receipt of this bundle, Benton forwarded two more drafts to Mt. Pleasant. These instruments were mailed with collection letters identical to those sent with earlier drafts. On January 12, 1976, the day these drafts arrived, Mt. Pleasant returned them with a typewritten note stating, "returned unpaid—Customer cannot pay. Thanks, Marguerite Foster."

In honoring the 26 drafts, Benton extended $74,375 in credit to Newcomb. Benton mitigated its losses by liquidating $9,298 of collateral pledged by Newcomb.

## PART II

At first glance, the U.C.C. may appear to be a compendium of confusing and seemingly contradictory rules enacted to govern myriad business transactions. Upon closer scrutiny, the U.C.C. is found to be a finely tuned statutory mechanism containing interlocking provisions designed to provide certainty in commercial transactions. Once the pieces of this puzzle are correctly aligned, the U.C.C. furnishes an answer to almost any question involving the rights and liabilities of the parties to a covered transaction. The present case is no exception.

To facilitate the flow of our analysis, we affix definitional labels, supplied by the U.C.C. (and BCC), to both the instruments and the parties.

The 26 instruments at the center of this dispute are a species of commercial drafts commonly known as checks. A check is a draft signed by the party to be charged (the drawer), ordering a bank (the drawee), to pay a specified sum, on demand, to a party (the payee). BCC, § 3.104. We find in examining the drafts[1] that Kenneth Wil-

---

1. *See* Appendix for representative sample of the drafts and collection letters involved in this case.

liams is the drawer [2] who ordered Mt. Pleasant, the drawee,[3] to pay Newcomb Auto Sales, the payee, for vehicles allegedly purchased. Because these checks were accompanied by automobile documents of title deliverable against honor of the drafts, they are documentary drafts. BCC, § 4.104(a)(6). *See also Wiley v. People's Bank and Trust Company*, 438 F.2d 513 (5th Cir. 1971).

■ We turn now to the parties involved. Mt. Pleasant is, by definition, a payor bank for it is a bank "by which an item is payable as drawn or accepted." BCC, § 4.105(2). We disagree with the district court's finding to the contrary. Further elucidation on the definition of payor bank is found in the official commentary accompanying this codical provision:

> The term payor bank includes a drawee bank and also a bank at which an item is payable if the item constitutes an order on the bank to pay, for it is then "payable by" the bank.

Official Comment 2, U.C.C., § 4.105(2).

Because it is designated as Williams' drawee, Mt. Pleasant is automatically classified as a payor bank.[4] *New Ulm State Bank v. Brown*, 558 S.W.2d 20 (Tex.Ct.App., 1st Div. Houston, 1977).

■ Benton served as a "depositary bank" as it was the first bank to which the 26 drafts were transferred for collection by Newcomb. BCC, § 4.105(1). Benton was also a "presenting bank" because it presented [5] the documentary drafts for payment to Mt. Pleasant and is not a payor bank. BCC, § 4.105(5). Finally, Benton is a "collecting bank" because it handled the item for collection and is not a payor bank. BCC, § 4.105(4).

Liability of a payor bank, such as Mt. Pleasant, for late return of an item [6] is set forth in BCC, § 4.302: [7]

> Payor Bank's Responsibility for Late Return of Item
>
> In the absence of a valid defense such as breach of a presentment warranty (Subsection (a) of Section 4.207), settlement effected or the like, if an item is presented on and received by a payor bank the bank is accountable for the amount of
>
> (1) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or regardless of whether it is also the depositary bank, does not pay or return the item or send notice of

---

**2.** Newcomb signed the 26 checks as Williams' disclosed and authorized agent. Williams is, therefore, bound as drawer of the checks. BCC, § 3.403.

**3.** We disagree with the district court's finding to the contrary.

**4.** The district court erred in labeling Mt. Pleasant Bank a "collecting bank," which is defined as "any bank handling the item for collection *except* the payor bank" (emphasis added). BCC, § 4.105(4). In a similar vein, we note that Mt. Pleasant is not a "presenting bank," although it is the institution which notified Williams that his drafts had arrived and were subject to payment. A "presenting bank" is defined as "any bank presenting an item *except* the payor bank" (emphasis added). BCC, § 4.105(5).

**5.** "Presentment" is a U.C.C. term of art meaning "a demand for acceptance or payment made upon the maker, acceptor, drawee or

other payor by or on behalf of the holder." BCC, § 3.504(a).

**6.** "Item" is a term broadly defined to encompass instruments such as the documentary drafts we are now considering. BCC, § 4.104(a)(7).

**7.** Reliance by the district court on § 4.202 as the statutory gauge by which Mt. Pleasant's performance should be judged is misplaced. Since Mt. Pleasant served in the capacity of a payor bank, it could not, by definition, be a collecting bank. *See* fn. 4 *infra* and BCC, § 4.105(4). Hence, U.C.C. rules detailing the duties of collecting banks, such as § 4.202, have no bearing on the issues at bar. Because § 4.202 is inapplicable, the district court's use of an ordinary care or negligence standard in evaluating Mt. Pleasant's conduct was erroneous.

dishonor until after its midnight deadline; or

(2) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents.

■ We conclude that the district court erred in determining that Mt. Pleasant could successfully assert "a valid defense such as breach of a presentment warranty (Subsection (a) of Section 4.207)" against Benton under § 4.302. Section 4.207(a) details the warranty of good title owed by customers and collecting banks to payor banks.[8] "Good title" simply means that the drafts bear no forged endorsements or signatures.[9] Since none of the signatures on the drafts are forged, Benton, as a collec-

ting bank, had not breached the good title warranty it owed to Mt. Pleasant.

■ As our analysis continues, we examine the substantive provisions of § 4.302. Application of subsection (1) is precluded because the instruments at issue are documentary drafts. We find, however, that the provisions of subsection (2) do relate to Mt. Pleasant's liability on these 26 documentary drafts,[10] if they are "properly payable."

■ Under § 4.104(a)(9) the phrase "properly payable" includes "the availability of funds for payment at the time of decision to pay or dishonor." This definitional requirement is satisfied because the 26 drafts were part of a series of authorized instruments, the first of which had been paid with funds deposited by Williams in his

8. BCC, § 4.207(a) provides:
   (a) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pays or accepts the item that
   (1) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and
   (2) he has no knowledge that the signature of the maker or drawer is unauthorized, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith
   (A) to a maker with respect to the maker's own signature; or
   (B) to a drawer with respect to the drawer's own signature, whether or not the drawer is also the drawee; or
   (C) to an acceptor of an item if the holder in due course took the item after the acceptance or obtained the acceptance without knowledge that the drawer's signature was unauthorized; and
   (3) the item has not been materially altered, except that this warranty is not given by any customer or collecting bank that is a holder in due course and acts in good faith
   (A) to the maker of a note; or
   (B) to the drawer of a draft whether or not the drawer is also the drawee; or
   (C) to the acceptor of an item with respect to an alteration made prior to the acceptance if the holder in due course took the item after the acceptance, even though

the acceptance provided "payable as originally drawn" or equivalent terms; or
   (D) to the acceptor of an item with respect to an alteration made after the acceptance.

9. Official Comment 1, following U.C.C., § 4.207, directs us to § 3.417 for a comprehensive explanation of the good title warranty. Official Comment 3 of U.C.C., § 3.417 interprets this as a warranty which insures that all endorsements and signatures on a draft are genuine and not forged. *See also* J. White & R. Summers, *Uniform Commercial Code*, at 510 (1972).

10. Dictum contained in *Wiley, supra*, at 516 indicates that Mississippi U.C.C. provisions analogous to Texas U.C.C. provisions, §§ 4.501 to 4.504, *may control liability of payor banks* which fail to accept or pay documentary drafts in a timely manner. Section 4.501, however, outlines duties owed by *collecting* banks to their customers with respect to documentary drafts. Similarly, § 4.503 details the obligations of a *presenting* bank dealing with documentary drafts. Because a payor bank, such as Mt. Pleasant, cannot also be a collecting or presenting bank, *see* fn. 4 *infra*, §§ 4.501 to 4.504 do not supply pertinent rules of liability applicable to payor banks handling documentary drafts. The sole source of liability for a payor bank under these circumstances is the strict accountability rule contained in § 4.302(2). To the extent *Wiley* may suggest that liability is predicated on §§ 4.501 to 4.504, we now indicate that such a reading of that decision would lead to error.

Mt. Pleasant account.[11] The subsequent insufficiency of funds in Williams' account does not deprive the drafts of properly payable status.[12] *New Ulm Bank* at 26. Appellee's protestations to the contrary are to no avail.

■ Because the drafts were properly payable, despite the overdraft, Mt. Pleasant was obligated "within the *time allowed* for acceptance or payment . . . [to] either accept[ ] or pay[ ] the item or return [ ] it and accompanying documents." BCC, § 4.302(2). The lack of funds did not excuse this performance. In addressing this issue the Texas appellate court observed in *New Ulm Bank, supra,* at 26:

> Furthermore, the insufficiency of the funds in the customer's account would not have relieved the bank of its responsibility to timely return the items in question to the transferring bank. New Ulm State Bank . . . had the statutory responsibility to return the drafts to its

transferor, notwithstanding the condition of its customer's account.

■ We next consider the phrase "time allowed," as found in § 4.302(2). Because the collection letters accompanying the drafts, as well as some of the drafts, were stamped "*pay* or *return* within 24 hours," it is necessary to determine U.C.C. time limits for both payment and return of documentary drafts by payor banks to presenting banks. Failure of Mt. Pleasant to perform these duties within the time limits prescribed mandates the imposition of strict liability for the face amount of any late instrument. Our search for the relevant time constraints under which a payor bank operates takes us to the official comments appended to § 4.302, which in turn guides us to § 4.301.[13] We find that this provision does not supply the answer we are seeking with regard to the time allowed for payment of documentary drafts by payor banks.[14]

---

11. *See* deposition of Marguerite Foster, Mt. Pleasant's bookkeeper who ran the collection desk, at pages 50-51. The district court erred in holding as a matter of law that the documentary drafts were not "properly payable."

12. We note § 4.401 provides that " . . . a bank may charge against his [the customer's] account any item which is otherwise properly payable from that account even though the charge creates an overdraft."

13. BCC, § 4.301, provides:
Deferred posting; Recovery of Payment by Return of Items; Time of Dishonor
(a) Where an authorized settlement for a demand item (other than a documentary draft) received by a payor bank otherwise than for immediate payment over the counter has been made before midnight of the banking day of receipt the payor bank may revoke the settlement and recover any payment if before it has made final payment (Subsection (a) of Section 4.213) and before its midnight deadline it
(1) returns the item; or
(2) sends written notice of dishonor or nonpayment if the item is held for protest or is otherwise unavailable for return.
(b) If a demand item is received by a payor bank for credit on its books it may return such item or send notice of dishonor and may revoke any credit given or recover the amount thereof withdrawn by its customer, if

it acts within the time limit and in the manner specified in the preceding subsection.
(c) Unless previous notice of dishonor has been sent an item is dishonored at the time when for purposes of dishonor it is returned or notice sent in accordance with this section.
(d) An item is returned:
(1) as to an item received through a clearing house, when it is delivered to the presenting or last collecting bank or to the clearing house or is sent or delivered in accordance with its rules; or
(2) in all other cases, when it is sent or delivered to the bank's customer or transferor or pursuant to his instructions.

14. Subsection (a) of § 4.301 is inapplicable to the present case for two reasons. First, it places "the cart before the horse" by addressing the question of when a payment may be revoked; it fails to articulate the time at which a payment must be made in the first instance. Second, this subsection is inapposite because it covers demand items other than documentary drafts. Similarly, subsection (b) does not advance our analysis as it provides pertinent timing rules for a payor bank serving in the dual capacity of a depositary bank. *See* Official Comment 2, § 4.301. Since Mt. Pleasant Bank does not fit the U.C.C. definition of "depositary bank," § 4.301(b) fails to specify the proper timing rule for the bank.

Finding no solution in chapter 4, we are invited by § 4.102 to survey the chapter 3 landscape,[15] if the instruments we are considering fall within the coverage of that chapter. Chapter 3 is the U.C.C. article governing negotiable instruments. Because all 26 drafts before us are negotiable, application of chapter 3 provisions to the instant case is in order.

The perceived gap in the coverage by § 4.301(a) and (b) is indeed filled by reference to a chapter 3 provision. Section 3.506(b) states in relevant part:

> . . . payment of an instrument may be deferred without dishonor pending reasonable examination to determine whether it is properly payable, but payment must be made in any event before the close of business on the day of presentment.

■ Determination of the presentment date is accomplished by recourse to § 3.503(b) which instructs that we consider the nature of the instrument, banking or trade practices, and the facts of the particular case. Given that the collection letters accompanying the drafts directed Mt. Pleasant to "*pay* or return within 24 hours," and that they further stated, "Do not hold for convenience of drawee unless otherwise instructed," demand for payment of the drafts, or presentment, occurred on the date Mt. Pleasant received the drafts. BCC, § 3.504(a). Because the drafts were not paid, Mt. Pleasant violated § 4.302 unless the drafts were returned timely.

■ Section 4.301(d)(2) states that a draft is returned in a timely manner when it is "sent or delivered to the bank's . . transferor or pursuant to his instructions."[16] To satisfy this provision, Mt. Pleasant was required to either deposit in the mail or deliver the unpaid drafts to Benton within 24 hours after such drafts were received. As to the first 24 drafts, Mt. Pleasant waited from two to 23 days before acting. The last two drafts were returned on the date received with a note of explanation: "returned unpaid—Customer cannot pay." We conclude that the absolute liability provisions of § 4.302(2) apply to the first 24 drafts because they were returned late. Mt. Pleasant must, therefore, pay the face amount of those drafts to Benton. However, the last two drafts were timely returned, in compliance with the requirements of § 4.301(d)(2), and therefore, Benton must sustain those losses.

The district court rejected Benton's demands and, therefore, it did not reach the issue of the application or apportionment of collateral security or the issue of interest. The collateral was liquidated for the sum of $9,298. The last two drafts, for which Benton remains solely responsible, total $4,000. Disposition of the collateral, plus the question of interest, must be determined on remand.

The judgment of the district court as it relates to the two drafts received by Mt. Pleasant on January 12, 1976, is AFFIRMED. The judgment of the district court as it relates to the 24 drafts received by Mt. Pleasant between December 15, 1975 and January 5, 1976 is REVERSED and Benton is to have judgment against Mt. Pleasant with respect thereto. The matter is REMANDED for determination of application or apportionment or other proper disposition of the collateral security held by Benton and for the consideration and award of interest, if found appropriate.

AFFIRMED in part, REVERSED in part, and REMANDED.

Appendix to follow.

---

**15.** BCC, § 4.102 provides in pertinent part:

To the extent that items within this chapter are also within the scope of Chapters 3 and 8, they are subject to the provisions of those chapters. In the event of conflict the provisions of this chapter govern those of Chapter 3 but the provisions of Chapter 8 govern those of this chapter.

**16.** BCC, § 1.201(38) defines the term "send" to mean "deposit in the mail or deliver for transmission by any other usual means of communication."

SAMPLE DRAFT:

SAMPLE COLLECTION LETTER:

**PLAINTIFF'S EXHIBIT 6-A**

## The UNION BANK of BENTON

We enclose for collection and credit - remittance WHEN PAID

NUMBER **11·742**

DEPOSITOR- NEWCOMB AUTO SALES

| DRAWN BY | DRAWN ON | DUE | AMOUNT | ATTACHMENTS |
|---|---|---|---|---|
| KENNETH WILLIAMS | SAME | ST. | $20,750.00 | Env. Drfts |

Instructions: To   CCI   WITH EXCHANGE IN FULL PAY AT PAR

FIRST NATIONAL BANK
COLL. DEPT.
MT. PLEASANT, TEXAS

DEC 26 1975

PAY OR RETURN WITHIN 24 HOURS

$3,150.00
$3,250.00
$3,400.00
$2,950.00
$3,600.00
$4,400.00

Date 12-23-75

Do not protest or wire non-payment unless otherwise instructed. Deliver documents attached only on payment of draft.

Do not hold for convenience of drawee unless otherwise instructed.   Form 222