**MEMPHIS AERO CORPORATION,**
Plaintiff-Appellee,

v.

**FIRST AMERICAN NATIONAL BANK,**
Defendant-Appellant.

Supreme Court of Tennessee.

Feb. 14, 1983.

J.O. Bass, Jr., H. Lee Barfield, II, Nashville, James J. White, University of Michigan Law School, Ann Arbor, Mich., for defendant-appellant.

Thomas P. Kanaday, Jr., Daniel W. Small, Nashville, for plaintiff-appellee.

## OPINION

HARBISON, Justice.

This case arises under the Uniform Commercial Code. It involves a claim against a commercial bank for late return of a documentary draft which it had received by mail. The Chancellor and the Court of Appeals held that the bank was liable for the amount of the draft. We reverse and dismiss.

There were some disputed factual issues at the trial. However, the following material facts either were undisputed or have been resolved by the courts below.

Appellant, First American National Bank in Nashville (American), received from Trust Company of Georgia on November 14, 1974 the following instrument which is the subject of this suit:

PAY AT SIGHT AT PAR
OTHER CHARGES TO BE PAID BY YOUR CUSTOMER
(WHEN PAYABLE)

ATLANTA, GA., November 12 19 74

PAY TO THE ORDER OF Piper Finance Corporation $ 30,664.00

Thirty thousand six hundred sixty-four dollars and no/100----------------------------------DOLLARS

Enclosures: Bill of Sale, Application for Registration, and Release of Lien

VALUE RECEIVED AND CHARGE TO ACCOUNT OF Mid-South Aviation, Inc.

TO First American National Bank
326 Union Street
Nashville, Tennessee 37237

Piper Finance Corporation
(DRAWER)
Regional Manager

Attention: Tim Comin

FILED 1980 MAR 25 PH 3:54

The documents referred to as "Enclosures" accompanied the draft. Stamped on the back of the instrument was the following:

FOR COLLECTION AND
IMMEDIATE REMITTANCE
All Prior Endorsements Guaranteed
PAY TO THE ORDER OF
ANY BANK OR BANKER
C NOV 12 1974 D
EXECUTIVE PARK OFFICE
TRUST COMPANY OF GEORGIA
64-10 ATLANTA, GEORGIA 64-10

Also accompanying the document was the following "collection letter" or "advice":

Mr. Tim Comin, an officer of American, received the draft and the other documents. He immediately notified an official of Mid-South Aviation with whom he had dealt on numerous occasions for more than a year. This official had previously advised Mr. Comin that he had authorized the draft. When the instrument arrived, however, Mid-South Aviation did not have sufficient funds to pay it. Although repeated promises were made to Mr. Comin that funds would be made available, this was never done.

The underlying commercial transaction involved the purchase of a Piper aircraft by Mid-South, a local retailer, from a regional Piper dealer, Memphis Aero Corporation. The latter had acquired it from the manufacturer, whose subsidiary, Piper Finance Corporation, retained a security interest. When the local dealer, Mid-South, sold the plane it advised Memphis Aero to draw a draft on First American.[1] Memphis Aero actually had this done by Piper Finance. It and Piper supplied the necessary accompanying title documents to be delivered by American to Mid-South upon payment of the draft. Piper sent the draft and other papers through its own bank, Trust Company of Georgia. The record does not show whether or not that bank gave provisional credit therefor to Piper.

Mid-South, a relatively new but high-volume Piper retail dealer in Nashville, was a customer of First American. It maintained

a checking account at that bank through which it passed large sums in connection with the purchase and sale of aircraft. The account was not under the control of any officer or official of American, was never frozen for any purpose, nor did American have authority to pay documentary drafts therefrom without approval from the depositor. American had made commercial loans to Mid-South from time to time, some collateralized and some not. It never at any time attempted to set off the customer's checking account against those loans. Only officials of Mid-South had authority to draw checks against the account. American had made no previous agreements with Mid-South or with Piper and Memphis Aero to finance the purchase of the aircraft in question by Mid-South or to carry overdrafts of the latter. It had on some prior occasions made loans to enable Mid-South to purchase planes, but the latter dealt with numerous other banks and also obtained financing from Memphis Aero.

Mr. Comin, the bank officer who handled the documentary draft upon its receipt, had little experience with such instruments. However he immediately notified Mid-South of its arrival and was advised that the latter would acquire sufficient funds to cover the draft but that such funds were not available on the day of presentment. Although he was in communication with both Piper and Memphis Aero by telephone

1. Validity of this sale, when Mid-South was not the registered owner of the plane, is not involved here. Memphis Aero later repossessed the plane but released it on advice of counsel.

no later than November 26 and advised them of the situation, Mr. Comin did not notify their agent Trust Company of Georgia of the dishonor of the draft, nor did he return it and the title documents until about December 20.

There were several questions presented in the courts below, but as the case comes here the only issue is whether appellant, a "payor bank" under the Code,[2] is strictly liable for the amount of the draft under T.C.A. § 47–4–302(b)[3] or whether its liability is limited to damages proximately caused by its negligence under the general provisions of T.C.A. § 47–4–103(5). If the latter measure is applied, no recovery is warranted because the bank customer, which owed the debt out of which the transaction arose, never had sufficient assets to pay the draft, and the item was essentially worthless at all relevant times. The Court of Appeals correctly held that

> "there is no evidence that, if First American had given timely notice of dishonor and made timely return of the draft and documents, Memphis Aero could have collected the amount due from Mid-South. That is, there is no evidence that Memphis Aero lost any amount as a proximate result of the action or inaction of First American."

On the other hand, the strict liability imposed under T.C.A. § 47–4–302(b) is applicable only if the documentary draft was a "properly payable" item as contemplated in the Code, including the requirement stated in T.C.A. § 47–4–104(i) of "availability of funds for payment at the time of decision to pay or dishonor."

Both the trial court and the Court of Appeals held that appellant, as a payor bank, was strictly liable under T.C.A. § 47–4–302(b), but the Court of Appeals did not address the issue of whether the draft was "properly payable." The Chancellor resolved this issue by holding that the payor bank was also a "joint drawee" of the documentary draft with its customer. The bank was, in fact, solvent and, therefore, had sufficient funds *of its own* to pay the draft. This was deemed to render it strictly liable under T.C.A. § 47–4–302(b) as a *payor bank* —although, as we understand it, liability under that section is not liability *on the document itself* but is liability for the mishandling (delay in giving notice or return) of the item. Making no distinction between liability of a drawee *on the instrument* and liability for mishandling by a *"payor bank,"* the Chancellor, following the insistence of appellee, virtually eliminated from the Code the requirement that before a payor bank can be held strictly liable for mishandling, a documentary draft must be "properly payable."

■ Appellee insists that the Code provision that "properly payable includes the availability of funds for payment at the time of decision to pay or dishonor" (T.C.A. § 47–4–104(i)) means sufficient funds of the *payor bank* as well as sufficient funds of the *debtor* in the commercial transaction. Very little authority exists for this proposition. Some of the cases most relied upon by appellee and by the courts below arose and were decided under the equivalent of T.C.A. § 47–4–302(a)—strict liability for not handling demand items by the banking "midnight deadline."[4] Liability is imposed under that provision of the Code, however, for mishandling items *"other than a documentary draft"* and *"whether properly payable or not."* There is a distinct difference between liability under subsection (a) and that under (b) of this Code section.

---

**2.** T.C.A. § 47–4–105(b).

**3.** With some exceptions not material here, a "payor bank" is liable for the amount of certain items not involved in this case and

> "(b) any other properly payable item unless within the time allowed for acceptance or payment of that item the bank either accepts or pays the item or returns it and accompanying documents."

**4.** *Rock Island Auction Sales v. Empire Packing Co.,* 32 Ill.2d 269, 204 N.E.2d 721 (1965) (action on a check); *Farmers Cooperative Livestock Market v. Second National Bank of London,* 427 S.W.2d 247 (Ky.1968) (draft equivalent to a check); *Engine Parts, Inc. v. Citizens Bank of Clovis,* 92 N.M. 37, 582 P.2d 809 (1978) (action on a sight draft but not a documentary draft).

In other cases cited by appellee where liability has been imposed upon a payor bank under subsection (b), there was no question that the debtor had on deposit with or made available to the payor bank sufficient funds to pay the draft.[5] In still others, the issue was never discussed. One federal case, cited by appellee as a "leading case," merely stated that a payor bank is liable under subsection (b) if it does not pay or return an "item" within a reasonable time and made no reference to the "properly payable" requirement of that statute.[6] This decision was followed by another from the same circuit, holding that the payor bank was obligated to pay late-returned drafts even though there were insufficient funds made available by the debtor and even though the payment would have created an overdraft.[7]

In the present case the debtor at no time had or made available to the payor bank, appellant here, sufficient funds for payment of the draft, which was timely presented. In our opinion the draft was not a "properly payable" item under T.C.A. § 47–4–302(b) so as to render the payor bank strictly liable for its late return. Liability, therefore, is governed by T.C.A. § 47–4–103(5), and the action fails for insufficient proof for damages.[8]

The Court of Appeals at several points drew an analogy between the liability of the drawee of a check and that of a payor bank respecting a documentary draft. There is a significant difference. Checks are usually referred to as "cash" or "demand" items, and the drawee must handle these under its midnight deadline, "whether properly payable or not." T.C.A. § 47–4–302(a). Sight drafts, unaccompanied by title documents, may also fall within that provision. *Farmers Cooperative Livestock Market v. Second National Bank,* 427 S.W.2d 247 (Ky.1968). Both the Chancellor and the Court of Appeals correctly held in the present case, however, despite the contention of appellee to the contrary, that the instrument involved here was a "documentary draft" as defined in the U.C.C.[9] It was described by some witnesses as an "envelope draft." As shown on its face, it was accompanied by a bill of sale to an airplane, a release of lien on the same, and an application for registration of title in the name of the vendee (the debtor in the transaction). The accompanying "advice" or "collection letter" from the transmitting bank called it a "Draft on Mid-South Aviation, Inc., N573 38" [the serial number of the plane], and instructed the appellant to *"Deliver documents only on payment."* Clearly it was contemplated that the title papers were to be "delivered against honor of the draft," T.C.A. § 47–4–104(f), and the draft was a "documentary draft," not a check or a simple sight draft which had to be proc-

5. *New Ulm State Bank v. Brown,* 558 S.W.2d 20 (Tex.Civ.App.1977) (bank "froze" account of customer and accumulated funds therein); *Suttle Motor Corp. v. Citizens Bank of Poquoson,* 216 Va. 568, 221 S.E.2d 784 (1976) (bank misapplied customer's funds and diverted them from payment of drafts).

6. *Wiley, Tate & Irby v. Peoples Bank and Trust Co.,* 438 F.2d 513 (Callaghan) (N.D.Miss.1971), aff'd 462 F.2d 179 (5th Cir.1972). Earlier the same court had held the items not to be documentary drafts at all, and had imposed liability under the subsection dealing with the "midnight deadline." This holding was reversed, the appellate court pointing out that documentary drafts are specifically excluded from that deadline. *See Wiley, Tate & Irby v. Peoples Bank and Trust Co.,* 438 F.2d 513 (5th Cir. 1971). Upon remand the trial court imposed liability under Section 4–302(b) of the U.C.C., holding that if the debtor had insufficient funds on deposit with or available to the payor bank, then the latter was strictly liable if it did not return the item or give notice of non-payment.

7. *Union Bank of Benton, Arkansas v. First Nat'l Bank in Mt. Pleasant, Texas,* 621 F.2d 790 (5th Cir.1980). Section 4–401 of the Uniform Commercial Code authorizes, *but does not require,* a bank to charge the account of a customer if it pays an *"otherwise* properly payable" item. *See* T.C.A. § 47–4–401 (emphasis added).

8. *Cf. Yeiser v. Bank of Adamsville,* 614 S.W.2d 338 (Tenn.1981).

9. " 'Documentary draft' means any negotiable or nonnegotiable draft with accompanying documents, securities or other papers to be delivered against honor of the draft." T.C.A. § 47–4–104(f).

essed under T.C.A. § 47–4–302(a) "whether properly payable or not."

■ Further, there is no contention in this case that appellant had agreed that it would pay the draft out of its own funds, that it would lend funds to the purchaser of the airplane or "floor plan" the craft, or that it had obligated itself to the sellers (the drawer and payee) so as to render it liable *on the instrument* for not immediately accepting or paying the draft. It was instructed to present the draft to the purchaser of the plane and to deliver the title papers to the latter only upon payment. It did timely present the draft. It did not timely return the documents to the transferor bank or notify the latter that the purchaser had insufficient funds to meet its obligation. Therein it was negligent. Had this negligence caused loss to the creditor, liability would follow, but there is no evidence that this occurred. Eight business days elapsed between receipt of the draft by appellant and telephone communication between it and the creditor that the draft had been dishonored upon presentment. There is conflicting evidence as to whether this was or was not a reasonable time, but we accept the findings of the courts below that the appellant was negligent in this respect and in not notifying the transmitting bank, agent of the creditors. In that regard, however, we note that the creditors (Memphis Aero and its financing company Piper Finance) by-passed their own agent, Trust Company of Georgia, the transmitting bank, and dealt directly with appellant, the payor bank. While appellant held the draft for a total of thirty-six days, the fact that it was holding the dishonored draft was known to the creditors upon the eighth business day (the twelfth calendar day), at the latest. They thereafter tried to deal directly with the debtor, Mid-South Aviation, to repossess the aircraft and to arrange new financing for the debtor. Only after these efforts failed did they demand that appellant return the draft. It did so immediately.

It will be recalled that under T.C.A. § 47–4–302(b) a payor bank becomes liable for a properly payable item "unless within the time allowed for acceptance or payment" of that item the bank either accepts, pays or returns it.

No specific time is provided under this section of the U.C.C. for the acceptance or payment of a documentary draft. Under special provisions of the Code dealing with the collection of documentary drafts, a collecting bank must "seasonably" notify "its customer" of dishonor. T.C.A. § 47–4–501. Unless otherwise instructed, a bank presenting a documentary draft must deliver the documents "to the drawee" on acceptance of the draft if payable more than three days after presentment or, otherwise, only on payment. T.C.A. § 47–4–503(a). Upon dishonor the presenting bank

"... must use diligence and good faith to ascertain the reason for dishonor, must notify its transferor of the dishonor and of the results of its effort to ascertain the reasons therefor and must request instructions." T.C.A. § 47–4–503(b).

A non-payor bank, that is one which is merely a collecting or presenting bank, is liable for damages proximately caused by its negligence in failing to carry out these duties. T.C.A. §§ 47–4–103(5), –105(d), –105(e). A "payor bank" becomes liable for the amount of the instrument if it fails to carry out its duties and if it is a "properly payable item." T.C.A. § 47–4–302(b).

■ It is clear that the "midnight deadline" applicable to the handling of checks and other demand items is not applicable to the handling of documentary drafts. Banking institutions are permitted a reasonable or "seasonable" time within which to present, remit or return. *Wiley, Tate & Irby v. Peoples Bank and Trust Co.,* 438 F.2d 513 (5th Cir.1971).

As noted by the Supreme Court of Virginia, and as abundantly illustrated by the testimony in the present record,

"The custom followed by banks in handling documentary drafts is not uniform. And the time permitted for their payment or return varies. What is seasonable time, and what is due diligence and

good faith, must necessarily depend upon the facts and circumstances of each case. The cashier of Citizens and Marine testified that while the policy of his bank was ten days without specific instructions, under certain circumstances, depending on the customer, an unpaid draft would be retained for a month before being returned." *Suttle Motor Corp. v. Citizens Bank of Poquoson,* 216 Va. 568, 221 S.E.2d 784, 786 (Va.1976).

A number of expert witnesses testified in the present case, representing banking institutions from different parts of this state. Others having knowledge of the subject testified to practices of banking institutions in New York, Atlanta and other parts of the United States. The time for holding a documentary draft, according to these witnesses, varies from two days to as much as ten days or longer. Witnesses from American testified that they customarily hold such drafts for about ten days.

We have already stated that we concur in the findings of the courts below that the holding period in the present case was unreasonable under all of the circumstances, although, in view of the direct communication between the creditors and the payor bank, it was not nearly so long or nearly so unreasonable as indicated by the courts below.

If, during the period while American was holding the draft, it had become "properly payable" and the bank had failed to pay or return, an entirely different case would be presented. That was the situation in *Suttle Motor Corp., supra.* There, while the bank was holding the drafts, funds came into its hands which should have been applied directly to the payment of those specific drafts. The title documents attached to the drafts should have been detached, delivered to customers who had made loans from the bank to purchase their automobiles, and the drafts paid out of the proceeds. Instead the bank applied those proceeds to other debts owed to it by the drawer of the drafts. It served its own interests, proximately and directly damaging the payee of the drafts who had caused them to be sent to the bank for collection. In one instance a bank customer named Harrell borrowed funds from the bank to finance the purchase of a car, and those loan proceeds were credited directly to the drawer of a draft which the bank was holding. The title papers attached to the draft were not delivered to the borrower, and the Supreme Court of Virginia said:

"Clearly the proceeds from the loan to Harrell should have been applied in payment of the Suttle draft, thereby enabling Harrell to obtain good title to her automobile." 221 S.E.2d at 787.

The Court further said:

"We do not have here a mere delay in the return of a draft. There was delay and inaction at a critical time when Poquoson was making a tremendous effort in its own behalf to reduce the losses which it obviously faced on the Batts and Hockaday account." 221 S.E.2d at 788.

These facts differ drastically from those presented in the present case. While the debtor, Mid-South Aviation, was indebted to American, the latter did not at any time divert funds or assets of Mid-South to the payment of its own claims when these should have been used to pay the draft which the bank was holding. This, indeed, is a case involving nothing more than "a mere delay in the return of a draft," and there is no evidence of any dereliction of duty or neglect other than failure of the bank official to give notice to the transferor bank or to give more prompt notice than he did to the creditors who undertook to deal directly with him.

No question was made in the *Suttle Motor Corp.* case, *supra*, but that liability was fixed under § 4–302(b) of the Uniform Commercial Code. The drafts in that case clearly were or became "properly payable" while the bank was holding them, because sufficient funds of the debtor did come into the possession of the bank to pay the drafts—a situation entirely different from that involved here.

We concur in the conclusions of the courts below that American was a "payor bank" and that it was negligent, but since

we do not find that the item was "properly payable," in our opinion liability should not have been imposed under T.C.A. § 47–4–302(b).

The judgments of the courts below are reversed and the suit is dismissed at the cost of appellee. The cause will be remanded to the trial court for collection of all costs accrued there.

FONES, C.J., and COOPER, BROCK and DROWOTA, JJ., concur.