**AMERICAN TITLE INSURANCE COMPANY, Plaintiff,**

**v.**

**BURKE & HERBERT BANK & TRUST COMPANY, Defendant.**

**Civ. No. 92–1064–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Feb. 9, 1993.

R. Peyton Mahaffey, Miles & Stockbridge, Fairfax, VA, for American Title Ins. Co.

John Francis McGinley, McGinley & Elsberg, Marc Elliott Albert, Tyler, Bartyl, Burke and Albert, Alexandria, VA, for Burke & Herbert Bank & Trust Co.

## MEMORANDUM OPINION

ELLIS, District Judge.

### I.

This diversity suit arises from the failure of defendant Burke & Herbert Bank & Trust Company ("Burke & Herbert") to return three checks presented to it for payment to their respective payees within the time period prescribed by *Va. Code* § 8.4–302.[1] Plaintiff, American Title Company ("American Title"), contends that Burke & Herbert is strictly liable for the untimely return of the checks, and that it may en-

---

1. This is § 4–302 of the Uniform Commercial Code ("U.C.C."), as adopted by the state of Virginia.

force payment from the bank in its own name as the transferee, assignee, and/or subrogee of the original payees. Burke & Herbert, on the other hand, contends that valid defenses exist to shield it from liability, and that American Title has no standing to maintain an enforcement action under this statute. This matter is properly before the Court on the parties' cross-motions for summary judgment, as no material facts are disputed. For the reasons stated below, the Court grants summary judgment in favor of Burke & Herbert.

## II.

American Title, a Florida insurance underwriter, issues title insurance policies, commitments, and endorsements through authorized agents. Landmark Title Corporation ("Landmark") was one of American Title's authorized agents. Specifically, it acted as American Title's agent in Virginia pursuant to a written agency agreement. Acting under this agreement, Landmark issued title insurance policies underwritten by American Title in connection with the sale and financing of Virginia real estate. To facilitate its responsibilities at real estate closings, Landmark maintained a trust account with defendant, Burke & Herbert, a Virginia banking institution located in Alexandria, Virginia. Landmark typically deposited into this account the funds it received in trust in connection with the closings, and then disbursed funds from the account to the appropriate parties.

In late July and early August of 1991, in connection with Virginia real estate closings, Landmark issued three checks that were drawn upon its Burke & Herbert trust account: (1) Check No. 3591, issued on July 31 for the amount of $226,562.12, made payable to HomeFed, F.S.B. of San Diego, California ("HomeFed"); (2) Check No. 3607, issued on August 2 for the amount of $50,110.12, made payable to American General ("American General"); and (3) Check No. 3628, issued on August 5 for the amount of $118,354.07, made payable to Marine Midland Bank ("Marine Midland"). These checks were forwarded by the payees through the Federal Reserve Bank system and presented to Burke & Herbert for payment on August 5 for the HomeFed check and on August 9 for the American General and Marine Midland checks.

Upon receipt of the HomeFed Check on August 5, Burke & Herbert debited the amount of the check from the Landmark trust account. This action caused the trust account to be overdrawn. Burke & Herbert called Landmark the next day and informed it of the deficiency in the trust account. This deficiency apparently arose because Landmark's vice president, Ron Ursano, had been embezzling funds from the trust account for some time. On August 6, in an effort to conceal his illegal activity, Ursano requested that Burke & Herbert not dishonor any checks presented for payment from the trust account. He falsely represented, *inter alia*, that Landmark had arranged a wire transfer to the trust account that would cover all checks to be drawn on the account, and that this transfer had somehow been misdirected. Later, when it became apparent to all parties that no such wire transfer was forthcoming, Ursano unsuccessfully attempted to secure a personal loan from Burke & Herbert to cover the deficiency in the trust account.

Choosing to rely on Ursano's misrepresentations, Burke & Herbert did not immediately dishonor and return the HomeFed check. In fact, even after it had informed Landmark that there were insufficient funds in the trust account to cover the HomeFed check, Burke & Herbert debited the American General and Marine Midland checks from the Landmark trust account upon their receipt on August 9. Not until August 13, 1991, did Burke & Herbert return all three checks to the respective payees, stamped "Insufficient Funds." In short, Burke & Herbert delayed return and rejection of the HomeFed check for eight days and that of the American General and Marine Midland checks for four days.

In September of 1991, in accordance with its obligations under Closing Protection letters issued to the payees, American Title made payments to HomeFed, American

General, and Marine Midland to replace the funds entrusted to Landmark. American Title had issued these Closing Protection letters to the payees in connection with certain real estate transactions for which it had provided title insurance through Landmark. The terms of these Closing Protection letters obligated American Title to reimburse the insured payees, subject to certain enumerated conditions and exclusions, for any actual losses suffered because of fraud or dishonesty on the part of the issuing title agent, Landmark. Pursuant to these letters, American Title was obligated to reimburse the payees for the losses arising from the nonpayment of the dishonored checks. On receiving reimbursement, the original payees delivered the dishonored checks, without endorsement, to the American Title.

American Title, in July 1992, brought this action seeking to recover for an alleged violation of *Va. Code* § 8.4–302 under a theory of equitable subrogation. Shortly thereafter, the three original payees endorsed the returned checks in favor of American Title, and executed written assignments to American Title of all rights, title, interest and claims arising out of these checks. American Title then successfully sought leave of the Court to amend its original complaint to allege, in addition to equitable subrogation, causes of action under § 8.4–302 as the holder, transferee, and assignee of the returned checks.

### III.

 Virginia's Commercial Code ("Code") establishes strict time limits within which a bank must take actions on checks presented for payment. *See Va. Code* § 8.4–302 (Michie 1991). The govern-

ing Code section provides, in pertinent part, as follows:

> In the absence of a valid defense such as breach of presentment warranty ..., settlement effected or the like, if an item is presented and received by a payor bank the bank is accountable for the amount of
>
> (a) a demand item other than a documentary draft whether properly payable or not if the bank, in any case where is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether or not it is also the depositary bank, does not pay or return the item or send notice of dishonor until after its midnight deadline; ...

It is well established that this provision imposes strict liability on payor banks for failure to meet the "midnight deadline" requirement.[2] *Suttle Motor Corp. v. Citizens Bank of Poquoson*, 216 Va. 568, 221 S.E.2d 784 (1976) (recognizing strict liability rule in Virginia).[3] Equally well established is that the purpose of § 8.4–302's strict liability rule is to satisfy the "need for finality and certainty in business transactions." *Citizens Fidelity Bank & Trust Co. v. Southwest Bank & Trust Co.*, 238 Neb. 677, 684, 472 N.W.2d 198, 202 (1991). Therefore, liability for the face amount of the check is imposed without regard to whether any damages have been sustained as a result of the payor bank's failure to make a timely return. *Id. See generally* 22 A.L.R.4th 10, *Payor Bank Accountability* (1983).

These principles applied here compel the conclusion that Burke & Herbert can be held strictly liable for the face amount of the three checks. It clearly failed to meet the midnight deadline requirement in han-

**2.** *Va. Code Ann.* § 8.4–104(h) defines a bank's "midnight deadline" as "midnight on its next banking day following the banking day on which it receives the relevant item...."

**3.** This is also the general rule in other jurisdictions. *See e.g., Central Bank & Trust Co. v. First Northwest Bank*, 332 F.Supp. 1166 (E.D.Mo. 1971), *aff'd* 458 F.2d 511 (8th Cir.1972) (applying Alabama and Missouri law); *Leaderbrand v. Central State Bank*, 202 Kan. 450, 450 P.2d 1 (1969); *Raymer v. Bay State Nat. Bank*, 384 Mass. 310, 424 N.E.2d 515 (1981); *First Wyoming Bank, N.A. v. Cabinet Craft Distributors, Inc.*, 624 P.2d 227 (Wyo.1981); *Yeiser v. Bank of Adamsville*, 614 S.W.2d 338 (Tenn.1981); *Rock Island Auction Sales, Inc. v. Empire Packing Co.*, 32 Ill.2d 269, 204 N.E.2d 721 (1965); *Western Air and Refrigeration, Inc. v. Metro Bank of Dallas*, 599 F.2d 83 (5th Cir.1979) (applying Texas law).

dling the three checks at issue in this case, as the undisputed record reflects that Burke and Herbert retained the HomeFed check for eight days and the American General and Marine Midland checks for four days from the date of their receipt without paying on or returning these items to the payees. Not until well after the statutorily prescribed time period were the checks dishonored and returned to the payees. Thus, under the well-settled principles just stated, Burke & Herbert is strictly "accountable."

■ But while the question of Burke & Herbert's strict liability is settled, the law is not settled as to which entities may sue and hold Burke & Herbert liable under § 8.4–302. Burke & Herbert contends that American Title lacks standing to bring this suit and cannot, as a matter of law, enforce payment for the face amount of the returned checks.[4] American Title, on the other hand, contends that it may enforce payment because (1) it is the assignee of any and all causes of action arising from the checks; (2) it is the transferee and holder of the returned checks; and (3) it stands in the shoes of the original payees pursuant

to equitable subrogation principles. The Court ultimately concludes that none of these theories of recovery confers proper standing on American Title. Put another way, American Title is not an entity to which Burke & Herbert is, in the statute's terms, "accountable" for the failure to meet the midnight deadline.

■ An examination of the nature of the banking industry's check collection and payment process supports this conclusion. For while the scope of standing to sue under § 8.4–302 is not clearly delineated in the Code provisions,[5] it is nonetheless circumscribed by the practical and economic realities associated with the check collection and payment process. This process, as governed by Article 4 of the U.C.C., typically begins with the payee of a check depositing this check at a bank. From this bank, the "depository bank," the check is then transferred through one or more intermediary or "collecting" banks until it reaches the "payor bank," the bank upon which the check is payable as drawn. In conjunction with each of these transfers, a collecting bank receives a provisional credit from the transferee, with the penultimate

---

**4.** In its answer to the amended complaint, Burke & Herbert adopted a scatter-shot approach and asserted thirteen affirmative defenses based on the following: (1) accord and satisfaction; (2) fraud; (3) waiver; (4) failure of consideration; (5) negligence; (6) payment and release; (7) estoppel; (8) set-off; (9) statute of limitations; (10) lack of standing; (11) a miscellaneous laundry list of arguments relating to this lack of standing; (12) laches and unclean hands; and (13) no accountability. Most of these defenses have apparently been abandoned, as they were neither asserted nor raised in the briefs and arguments. In any event, because the resolution of the standing question is dispositive, the other defenses need not be addressed.

**5.** The Code does not specify with precision who may sue a payor bank for violation of the midnight deadline requirement. According to the Official Comments to § 8.4–302, "Section 4–302 states the rights of the *customer* if the payor bank fails to take the action required within the time limits prescribed." (emphasis added) Yet the definition of "customer," found elsewhere in the Code at § 8.4–104, is not very illuminating on the scope of standing under § 8.4–302. This definition provides, in pertinent part, as follows:

"In this Article, unless the context otherwise requires ... 'customer' means any person for

whom a bank has agreed to collect items and includes a bank carrying an account with another bank."

*Va.Code* § 8.4–104. This provision defines a "customer" only by reference to its relationship to a "collecting" bank. Given that a "payor bank" cannot be a "collecting" bank pursuant to the express terms of § 8.4–105(d), § 8.4–104's definition of "customer" provides little guidance as to what relation a person or bank must have with a *payor bank* in order to take advantage of § 4–302. Nor does a precise definition of "customer" in the context of a payor bank's violation of § 4–302 appear in relevant treatises. *See e.g.,* 7 Anderson, *Uniform Commercial Code,* § 4–302:3, p. 108 (1985) ("If it fails to take such actions within the time specified, the rights of the customers are as specified by § 4–302."); Reitman, Weisblatt, Schlicting, Rice, Cooper, 6 *Banking Law* § 135.02 (1991) ("customer of a bank is a person, including another bank, who employs either the payment or collection function, or both, who has an account with the bank or for whom the bank has agreed to collect items.")

At best, the Official Comments to § 8.4–302 make the obvious point that an entity must have some direct connection with the check collection and payment process in order to bring suit under § 4–302.

bank in the collection chain receiving its provisional credit from the payor bank. Upon final payment by the payor bank, these provisional credits firm up into a final settlement along the chain of collection. Conversely, if a payor bank dishonors and returns a check, these provisional credits are reversed and no final settlement is made. But whatever course of action the payor bank elects, it must take such action within the strict time limits established by § 4–302's midnight deadline rule. *See* Clark, *The Law of Bank Deposits, Collections, and Credit Cards,* ¶ 5.01 (3d ed. 1990). Without these strict time limits, the dependent chain of credit created by presentment of a check would threaten the efficient operation of the banking industry. Thus, it is plain to see that § 8.4–302's insistence on such prompt action inures to the benefit of the general public. Yet it is equally clear that the primary intended beneficiaries are those entities in the check collection and payment process who are entitled to rely on the payor bank's adherence to the midnight deadline requirement. Given this, and given that § 8.4–302 plainly does not confer standing to the public at large, it follows that standing to sue for a § 8.4–302 violation is limited to those entities who, by virtue of their relation to the check transaction, either did suffer, or might have suffered, a loss that falls within the scope of the risk of loss created by the bank's failure to take prompt action in accordance with the statute. In other words, this statute confers standing to sue on a limited class comprised of those involved in the collection and payment of the check at issue who may be directly harmed (but are not necessarily actually harmed)

by the failure of the payor bank to adhere to the § 8.4–302 midnight deadline.

 Falling squarely within this class is the payee of a check who presents it through the collection chain to a payor bank for payment. A payee clearly has standing to bring suit for the payor bank's failure to pay or return this check in a timely fashion because of its potential reliance on the payor bank's prompt action.[6] Nor does any question of standing arise where the original payee of a check assigns and/or transfers her rights in the instrument to another entity *prior* to its presentment for payment. In that event, the assignee/transferee simply steps into the shoes of the original payee and is entitled to § 8.4–302's protection once it initiates the collection and payment process. The assignment and transfer of a check before its presentment does not trigger the operation of § 8.4–302. As noted above, it is the potential reliance on payor bank action that arises once a check is actually presented that provides the basis for standing to sue under § 4–302.

 In light of this principle, American Title's acquisition of ownership interests in the checks and written assignments from the original payees does not, under the circumstances presented here, entitle it to bring suit for Burke & Herbert's violation of the midnight deadline requirement. To be sure, the record reflects that the original payees of the returned checks transferred these checks to American Title, endorsed them pursuant to a negotiation, and subsequently executed written assignments of all rights, title, and interest arising out of these checks in favor of American Title. But American Title became the transferee and holder of the checks, as well

---

**6.** As one commentator has stated:

"The policy behind the midnight deadline is to keep the drawee [payor] bank on a short leash. Since the drawee [payor] bank will bear the risk of the drawer's insolvency once the midnight deadline passes, payees and other holders of checks know that they are safe after passage of a relatively short period of time. As a result, they are willing to treat checks as cash equivalents. Moreover, it is the drawee [payor] bank that is in the best position to know the status of the drawer's

account. In short, the rule that a check is 'finally paid' by the running of the midnight deadline facilitates commerce."
Clark, *supra,* § 5.02 (3d Ed.1990). *See also Farmers Cooperative Livestock Market, Inc. v. Second Nat. Bank,* 427 S.W.2d 247, 249 (Ky. 1968) ("A realistic reading of [§ 4–302] compels the conclusion that failure to meet the midnight deadline authorizes the person presenting the check to assume it has been honored and will he paid. Banking practices require the prompt settlement of such items because of the chain of credit dependent thereon.")

as the assignee of all rights arising from these instruments, well after their untimely return by Burke & Herbert and with full knowledge that they had been dishonored for insufficient funds. At the time of their presentment by the payees, American Title had no vested interest in the timely payment or return of these checks. Nor can American Title claim to have taken action in reliance on the midnight deadline requirement. By the time checks were acquired by American Title, the untimely dishonor had already occurred. Thus, where, as here, a party becomes a holder, transferee and assignee of checks *after* their untimely return by a payor bank, that party has no standing to bring a cause of action for the bank's violation of § 4–302.[7] Limiting standing in this manner does not, in any way, diminish the deterrent sting of § 8.4–302's strict liability rule, for it simply entrusts enforcement of this rule to those with the greatest incentive to enforce compliance.

---

**7.** American Title's reliance on *Northwestern National Insurance v. Midland National Bank,* 96 Wis.2d 155, 292 N.W.2d 591 (1980), to support its contention that causes of action under § 4–302 are freely assignable is unpersuasive. Admittedly, the Wisconsin Supreme Court appears to have permitted a plaintiff to enforce payment under § 4–302 where it had been assigned all rights, interests, and claims to two checks on which the payor bank had not taken action until after its midnight deadline. Yet language in that opinion suggests that the court construed the assignment in that case as one of the *proceeds* of the two checks at issue, not as an assignment of a cause of action for enforcement of a statutory penalty under § 4–302. *See* 96 Wis.2d at 172, 292 N.W.2d at 600 ("There appears to be in the record an assignment by W. Robert Ward as trustee of this account to Northwestern of 'all of his right, title, and interest in the said two checks and all claims of W. Robert Ward, Trustee, against the Midland National Bank' ... [T]here is nothing in the agreement limiting the trustee's right to assign property interests subject to the trust...."). In any event, this Court parts company with *Northwestern* to the extent that opinion holds that violation of § 4–302 creates property rights in the proceeds of the mishandled checks that are freely assignable. No property rights automatically attach as a result of a payor bank's failure to meet its midnight deadline. Rather, as discussed below, § 4–302 simply permits an action for enforcement of a statutory penalty liquidated in the face amount of the items improperly retained.

Even assuming that *Northwestern* is read to hold that the right to bring a § 4–302 enforcement action can be assigned *after* a payor bank's violation of its midnight deadline, that case remains factually distinguishable from the case at bar. *Northwestern's* plaintiff was one of the original co-payees of the checks at issue, and along with the co-payee, a contractor, it had endorsed the checks in favor of the trustee of a trust account. This trust account, established by the co-payees, was to be maintained in order to enable the contractor to complete contracts on which Northwestern was acting as surety, and Northwestern subsequently received assignments from the trustee following the payor bank's failure to revoke provisional settlements within the time period prescribed by § 4–302. Thus, at the time of their presentment, Northwestern was in a position to rely on prompt action by the payor bank in handling the checks, given its vested interest in the proper maintenance of the trust account. No such circumstances exist here.

Moreover, even assuming *Northwestern* permits the unrestricted assignment of § 4–302 causes of action in Wisconsin, this runs counter to Virginia's prohibition against such assignments. *See Va.Code* § 8.01–26 ("Only those causes of action for damage to real or personal property, whether such damage be direct or indirect, and causes of action ex contractu are assignable."). In Virginia, therefore, a cause of action for violation of § 4–302 cannot be assigned, for it is neither a tort cause of action for damage to real or personal property nor a contract cause of action; it is a cause of action for breach of statutory duty. *See Chicago Title Insurance Co. v. California Canadian Bank,* 1 Cal. App.4th 798, 808, 2 Cal.Rptr.2d 422 (1991) (holding that § 4–302 creates statutory liability independent of negligence); *Citibanc of Alabama/Fultondale v. Tricor Energies, Inc.,* 493 So.2d 1344 (Ala.1986) (holding that § 4–302 suit falls under statute of limitations for statutory penalty, not conversion); *First State Bank v. Twin City Bank,* 290 Ark. 399, 720 S.W.2d 295 (1986) (holding that § 4–302 creates statutory liability independent of negligence); *Bank of America v. Security Pacific National Bank,* 23 Cal.App.3d 638, 100 Cal.Rptr. 438 (1972) (holding that § 4–302 creates liability independent of negligence or conversion); *Union Bank of Benton v. First National Bank,* 677 F.2d 1074, 1078 (5th Cir.1982) (characterizing § 4–302 action as one for breach of statutory duty); 7 Anderson, *Uniform Commercial Code,* § 4–302:3, p. 108 (1990); 6 Hawkland, Leary and Alderman, *Uniform Commercial Code Series,* § 4–302.07, p. 105 (1984) ("[A] suit under U.C.C. section 4–302 [is one] for breach of statutory duty."). *But see Pulaski Bank and Trust Co. v. Texas American Bank/Fort Worth, N.A.,* 759 S.W.2d 723 (Tex. App.1988) (holding that § 4–302 action sounds in tort); *Peoples Bank in North Fort Myers v. Bob Lincoln, Inc.,* 283 So.2d 400 (Fla.App.1973) (same).

Seeking to overcome its lack of standing, American Title argues that it is entitled to collect the face amount of the returned checks, as if it were the original payee, regardless of when it acquired the instruments. Specifically, American Title contends that it stands in the shoes of the original payees and is the holder of the checks because it received the checks, endorsed by the payees, through a negotiation. Given that § 8.3–301 provides that a holder of a negotiable instrument may enforce payment in his own name, American Title argues that it is entitled to collect the face amount of the returned checks, and that the public interest in maintaining the freely transferrable nature of negotiable instruments militates in favor of this result.

This argument misconstrues the nature of a § 4–302 enforcement action. It is not an action on the instrument itself. *See Idah–Best, Inc. v. First Security Bank, N.A.*, 99 Idaho 517, 584 P.2d 1242, 1253 (1978); *Goodman v. Norman Bank of Commerce*, 565 P.2d 372, 374 (Okla.1977); *Security Bank & Trust Co. v. Federal National Bank & Trust Co.*, 554 P.2d 119 (Okla.App.1976). Rather, it is an action for breach of a statutory duty. *See supra*, note 7. In pursuing this action, a plaintiff seeks to enforce a statutory penalty, not to collect the proceeds from the instrument. That the amount of this statutory penalty has been held to be liquidated in the face amount of the items improperly retained beyond the midnight deadline does not convert this cause of action into a collection action on a negotiable instrument.

Having established that American Title lacks proper standing as transferee, holder, and assignee of the returned checks, the Court further concludes that no basis for equitable subrogation exists in light of the undisputed facts presented. Subrogation is a purely equitable doctrine. It does not flow from any fixed law, but from the principles of justice, equity and benevolence. *State–Planters Bank & Trust Co. v. Pollard & Bagby Inv. Corp.*, 186 Va. 217, 42 S.E.2d 287 (1947). To be sure, the doctrine of subrogation has been greatly expanded and is sufficiently broad to cover all cases in which one person pays an obligation that, in justice and good conscience, should have been paid by another. *Federal Land Bank v. Joynes*, 179 Va. 394, 18 S.E.2d 917 (1942). Because subrogation is not a matter of right, but of equity, its appropriateness "depends on the facts of each particular case, to which must be applied the principles of justice." *Petra International Banking Corp. v. First American Bank*, 758 F.Supp. 1120, 1131 (E.D.Va.1991) *aff'd without op. Petra International Banking Corp. v. Dameron International, Inc.*, 953 F.2d 1383 (4th Cir. 1992).

American Title contends that its payment to the payees of monies they rightfully could have obtained from Burke & Herbert entitles it to recover this payment from Burke & Herbert as the subrogee of the original payees. Not so. American Title paid the original payees for losses incurred because of Ursano's fraud pursuant to its obligations under the Closing Protection letters it had issued in connection with real estate closings involving the original payees. While Burke & Herbert may have been liable under § 4–302 had these payees brought an enforcement action, its statutory liability is not, in any way, related to American Title's obligations to the payees under the Closing Protection letters. In fact, had Burke & Herbert timely dishonored the checks for insufficient funds, American Title would still have been obligated to reimburse the original payees for the losses resulting from Ursano's embezzlement. That the original payees elected to pursue their rights against American Title under the Closing Protection letters, and did not to pursue the separate and independent alternative of suing Burke & Herbert under § 4–302, does not provide American Title with any equitable rights against Burke & Herbert. As such, the Court concludes that American Title cannot enforce payment for the face amount of the dishonored checks pursuant to principles of equitable subrogation.

## IV.

For the reasons stated above, the Court concludes that American Title has no stand-

ing to bring an enforcement action against Burke & Herbert pursuant to Va.Code Ann. § 8.4–302. Accordingly, the Court grants summary judgment for Burke & Herbert. An appropriate issue has issued.

The Clerk is directed to send copies of this Order to all counsel of record.