[No. 19995-9-III. Division Three. February 4, 2003.]

BANK OF AMERICA NT & SA, *Respondent*, v. DAVID W. HUBERT, P.C., ET AL., *Appellants*.

372

*Patrick N. Rothwell* (of *Abbott Davis Rothwell Mullin & Earle, P.C.*), for appellants.

*Jed W. Morris* (of *Lukins & Annis, P.S.*), for respondent.

SWEENEY, J. — This appeal follows Seafirst Bank's successful action to recover from its customer funds lost as the result of a check-kiting scheme. The customer argues that Seafirst was required to credit the disputed funds to the customer's account because the payor bank missed the "midnight deadline" to dishonor the check. We agree and reverse and remand for entry of judgment in favor of the customer.

## FACTS

Attorney David W. Hubert (Mr. Hubert) incorporated as David W. Hubert, P.C. (Hubert P.C.).[1] He operates Law Clinic Northwest in Spokane. In the same building, paralegal Gail Williams ran Washington Paralegal Services, Inc. Hubert P.C. engaged Ms. Williams to manage real estate closings. Hubert P.C. opened two IOLTA[2] pooled trust accounts with Bank of America (Seafirst) for real estate closing funds. Ms. Williams was an authorized signer on both accounts. One of those accounts is the subject of this litigation.

Over a six- to nine-month period in 1998, Ms. Williams kited[3] checks between the Seafirst IOLTA and her own accounts at Key Bank and other banks. She diverted funds

---

[1] This opinion refers to the individual as Mr. Hubert, the business entity as Hubert P.C., and the appellant as Hubert.

[2] The Interest on Lawyer Trust Accounts (IOLTA) program requires attorneys to pool small or short-term client deposits into special bank accounts. The interest on these accounts is then used to fund legal services programs. *See, e.g.*, Jay Carlson, Comment, *Interest or Principles?: The Legal Challenge to IOLTA in Washington State*, 74 WASH. L. REV. 1119, 1120 (1999).

[3] Essentially, a kite works on the "float" between two bank accounts. *Town & Country State Bank of Newport v. First State Bank of St. Paul*, 358 N.W.2d 387, 390 (Minn. 1984). The check kiter opens an account at one bank. He or she writes a check on that account for a large sum. He or she then deposits that check into a second account at a different bank. The check is not supported by sufficient funds. Bank 2 is unaware of this and provisionally credits the second account for the amount. During the several day hiatus while the bad check written at bank 1 is being processed, the check kiter covers it with another check from bank 2. The process is repeated until one of the banks refuses to honor a check for insufficient funds. *Williams v. United States*, 458 U.S. 279, 281 n.1, 102 S. Ct. 3088, 73 L. Ed. 2d 767 (1982).

from the IOLTA to her own accounts. She was eventually convicted of bank fraud. Seafirst sued to recover the IOLTA deficit remaining after the kiting scheme crashed.

TIMELINE

The significant events by date are:

- September 16, 1998 (Wednesday): The IOLTA balance is negative $64,243.09. Ms. Williams executes three wire transfers from the IOLTA totaling $171,710.61.

- September 16: Ms. Williams deposits into the IOLTA two checks totaling $193,866.44 drawn on her own account at Key Bank. Seafirst provisionally credits the IOLTA and forwards the checks to Key Bank for collection.

- September 17 (Thursday): Checks arrive at Key Bank.

- September 17: The Key Bank account has insufficient funds. Ms. Williams stops payment on the checks at Sterling Savings.[4]

- September 18 (Friday): Checks arrive at Fiserv (Sterling's check processing company) and are processed.

- September 18 (midnight): Key Bank's midnight deadline.

- September 21 (Monday): Checks arrive at Sterling Savings Bank.

- September 22 (Tuesday): Checks returned to Seafirst.

- September 22: Seafirst charges back the IOLTA for the provisional credit and issues Hubert notice of dishonor of the Key Bank checks.

The IOLTA account winds up short by $63,853.46.

PROCEEDINGS

Seafirst sued Ms. Williams, Hubert P.C., and David and Katharine Hubert individually, to recover the deficit under two legal theories.

---

[4] Earlier that year, before these checks were written, Key Bank sold its accounts to Sterling Savings. Key Bank customers continued using preprinted checks naming Key Bank as payor bank.

Seafirst first alleged breach of contract against the Huberts individually and against Hubert P.C. based on the standard form customer agreement. The agreement is incorporated by reference as part of the account signature card. Essentially, the customer promises to make up any deficits in the account. David and Katharine Hubert and Ms. Williams signed the signature card when the IOLTA account was set up.

By way of affirmative defense, Hubert alleged that Seafirst lost the right to charge back the IOLTA for the worthless Key Bank checks because Key Bank missed the statutorily imposed midnight deadline to dishonor the checks. A payor bank must issue notice of dishonor before midnight of the banking day following the day upon which it receives the check. RCW 62A.4-301(a). Key Bank did not do this. Hubert contended the checks were, therefore, "finally paid" as a matter of law. Clerk's Papers (CP) at 28. Hubert also counterclaimed for damages, alleging that Seafirst failed to meet its own midnight deadline to notify him of the dishonor by Key Bank. Therefore, Seafirst had no right to charge back the IOLTA. Finally, Hubert sought damages from Seafirst for wrongful wire transfer. The court denied a motion to amend the complaint to add the latter two claims (notice of dishonor and wrongful transfer), but in its final order, the court ruled on both.

Seafirst also alleged negligence against Mr. Hubert and Hubert P.C. based on Mr. Hubert's failure to supervise Ms. Williams.

Seafirst moved for summary judgment. Hubert also moved for summary judgment. Seafirst voluntarily dismissed the contract claims against the Huberts individually without prejudice, while maintaining its contract claim and negligence claim against Hubert P.C.

The court granted Seafirst summary judgment on the contract claim. The court also granted Seafirst summary judgment on its negligence claim against Hubert P.C. The court dismissed all but one of Hubert's affirmative defenses. The court ruled that the sole defense available to Hubert at

trial would be that Seafirst breached a general duty of care in failing to detect the check-kiting scheme. The court also summarily dismissed Hubert's notice of dishonor and wrongful wire transfer claims. The court granted Seafirst's request for attorney fees pursuant to the customer agreement.

## DISCUSSION

We review summary judgment de novo. *Hertog v. City of Seattle*, 138 Wn.2d 265, 275, 979 P.2d 400 (1999). Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. *Id.*

We answer the questions who should bear the loss caused by Ms. Williams' mischief and why.

CONTRACT CLAIMS

The terms of the Uniform Commercial Code (UCC) may be varied by agreement of the parties. But the agreement cannot relieve a bank of liability for the failure to exercise ordinary care. RCW 62A.4-103(a). Seafirst argues that the rights and obligations between itself and Hubert were governed by the customer agreement. Hubert agreed to cover any deficiencies: "[Y]ou promise to deposit money in your account to cover the deficiency as soon as we notify you." CP at 15.

▆▆▆▆ Hubert does not dispute either the substance or the effect of this contract. His only assignment of error is that Seafirst did not produce the original of the signature card and agreement. But the rules of evidence accommodate the admission of a duplicate. ER 1003. The question of admissibility of evidence is addressed to the sound discretion of the trial judge. *Equitable Life Leasing Corp. v. Cedarbrook, Inc.*, 52 Wn. App. 497, 504, 761 P.2d 77 (1988). The photocopy in the record is not a crystal clear reproduction. But it shows, among other things:

- The names and signatures of David and Katharine Hubert and M. Gail Williams;

- The name and address of Law Clinic Northwest; and
- The incorporation by the bank of the Seafirst customer agreement.

The trial judge did not, then, abuse his discretion by admitting the deposit account signature card and related documents. Again, Hubert does not dispute that the legal effect of this customer agreement is to unequivocally obligate him to cover overdrafts.

MIDNIGHT DEADLINE

The next question is whether the account would have been overdrawn if Seafirst had fulfilled its obligations as a collector bank. That is, did Key Bank's failure to meet its midnight deadline and Seafirst's acceptance of the late return checks require Seafirst to credit Hubert's IOLTA for the two checks Ms. Williams drew on Key Bank?

Hubert accurately points out that Key Bank, the "drawee" or "payor" bank, failed to dishonor the two checks drawn by Ms. Williams within the time limit imposed by the "midnight deadline." He claims that the collector bank, Seafirst, should, therefore, have credited his account for the amount of these checks. Seafirst defends Key Bank's failure on various grounds.

*Definitions.* In order to understand the effect of the midnight deadline, we will first identify and define the legal roles of the various players in this dispute.

- A *payor bank* is a bank that is the drawee of a draft (Key Bank). RCW 62A.4-105(3).
- A *drawee* is a person ordered in the draft to make payment. RCW 62A.4-104(a)(8). Absent any ambiguity on the face of a check, the drawee named is the payor bank (Key Bank).
- A *depository bank* is the first bank in the collection process to receive the check (Seafirst). RCW 62A.4-105(2).
- A *collecting bank* is any bank that handles the item during the collection process, except the payor bank (Seafirst). RCW 62A.4-105(5).

Seafirst was then both the depository bank and a collecting bank for the disputed checks. Key Bank was named as the drawee on the face of the checks. Key Bank is, therefore, the payor bank.

*Statement of the Rule.* The " '[m]idnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item . . . ." RCW 62A.4-104(a)(10).

A payor bank is strictly accountable for the amount of a check, whether or not the check is properly payable, if the bank fails to pay, return, or send notice of dishonor of the check before its midnight deadline. RCW 62A.4-302(a)(1). Key Bank's deadline was midnight on September 18.

*History.* A brief history of the midnight deadline helps explain its importance. Prior to World War II, drawee or payor banks provided "final settlement" for a check on the day it was presented. That is, the bank had to make up its mind immediately whether it would honor a check or not. But after the war, the number of checks being circulated increased substantially. The banking industry argued it needed more time to make the decision to honor or dishonor. And the midnight deadline was born. 1 BARKLEY CLARK & BARBARA CLARK, THE LAW OF BANK DEPOSITS, COLLECTIONS AND CREDIT CARDS ¶ 6.01[2], at 6-2 (rev. ed. 2002).

■ *Purpose.* The ultimate purpose of the midnight deadline is to facilitate commerce. It does this by keeping the drawee bank on a short leash. CLARK, *supra*, ¶ 6.01[3][d], at 6-6. The midnight deadline is a way to definitely fix responsibility for an insufficient funds check. The midnight deadline gives the payor bank additional breathing room to pay, dishonor, or return a check. But the rule imposes strict accountability and requires strict compliance. *Am. Nat'l Bank & Trust Co. of Chi. v. Cent. Bank of Denver*, 132 B.R. 171, 173 (Bankr. D. Colo. 1991).

■ *Effect of Strict Accountability.* Accountability under the midnight deadline is absolute. This is so even for kited checks. *First Nat'l Bank in Harvey v. Colonial Bank*, 898 F.

Supp. 1220, 1226-27 (N.D. Ill. 1995). And accountability means liability. The negligence "ordinary care" standard does not apply. *Rock Island Auction Sales, Inc. v. Empire Packing Co.*, 32 Ill. 2d 269, 272-73, 204 N.E.2d 721, 723 (1965). Actual loss is not required to recover.[5] The bank is absolutely liable for the check regardless of actual damages. *Rock Island*, 204 N.E.2d at 723; *Blake v. Woodford Bank & Trust Co.*, 555 S.W.2d 589, 601 (Ky. Ct. App. 1977); CLARK, *supra*, ¶ 6.02[1][b], at 6-18.

■ *Obligation of Collecting Bank (Seafirst) to Credit Account.* "If a collecting bank receives a settlement for an item which is or *becomes final*, the bank is *accountable to its customer* for the amount of the item and any provisional credit given for the item in an account with its customer *becomes final*." RCW 62A.4-215(d) (emphasis added).

So the next question is when does settlement for a check become "final" for the purposes of RCW 62A.4-215(d). Because once the credit is final, the customer is entitled to the credit and cannot be charged back.

And that question is answered by RCW 62A.4-301(a): "the payor bank may revoke the settlement and recover the settlement if, before it has made final payment *and before its midnight deadline*, it: (1) *Returns* the item; or (2) *Sends written notice* of dishonor or nonpayment if the item is unavailable for return." (Emphasis added.) A payor bank finally pays an item if, after making a provisional settlement for the item, it fails to revoke the settlement. RCW 62A.4-215(a)(3).

Here, the check was *not returned* nor was any *notice of dishonor* sent by Key Bank to Seafirst by the midnight deadline. So, absent some defense, Hubert's provisional credit for the Williams deposits became final. RCW 62A.4-

---

[5] *See, e.g. Appliance Buyers Credit Corp. v. Prospect Nat'l Bank of Peoria*, 708 F.2d 290 (7th Cir. 1983) (court contrasts strict liability of drawee bank with "actual damages" standard applicable to collecting banks making tardy returns); *Am. Title Ins. Co. v. Burke & Herbert Bank & Trust Co.*, 813 F. Supp. 423, 426 (E.D. Va. 1993), *aff'd*, 25 F.3d 1038 (4th Cir. 1994); *Chi. Title Ins. Co. v. Cal. Canadian Bank*, 1 Cal. App. 4th 798, 2 Cal.Rptr. 2d 422, 427 (1991); *Rock Island*, 204 N.E.2d at 723.

-215(d). And this is so whether the check is properly payable or not. If the payor bank fails to pay or return the check or send notice of dishonor until after its midnight deadline, it is accountable. RCW 62A.4-302(a)(1).

Again, the midnight deadline requires strict compliance. *Am. Nat'l Bank,* 132 B.R. at 173. And this is so even for kiting. *First Nat'l Bank,* 898 F. Supp. at 1226-27.

SEAFIRST'S DEFENSES

Seafirst raises a number of arguments to excuse Key Bank's failure to meet the midnight deadline. We address them in order.

■ *Key Bank as Payor Bank.* Seafirst argues that Key Bank ceased to be the payor bank when it sold its accounts to Sterling Bank, which processed checks through yet another entity, Fiserv. Seafirst contends that Sterling is the payor bank. If this is correct, then the running of the midnight deadline would not have been triggered until the checks were presented to either Sterling or Fiserv. And if that is so, the midnight deadline was arguably met. Fiserv received the checks on the 18th and returned them to Sterling Savings before midnight on the 19th.

Sterling was not the payor bank, however. The payor bank is the bank that is the drawee named on the draft. RCW 62A.4-105(3). And absent any ambiguity on the face of the item, the drawee *named on the instrument* is the payor bank. *See, e.g., Gathercrest Ltd. v. First Am. Bank & Trust,* 649 F. Supp. 106, 116-17 (M.D. Fla. 1985), *aff'd,* 805 F.2d 995 (11th Cir. 1986), and cases cited. Banks may enter into agreements with each other to modify the collection process. The owner of the check is not bound, however, unless he is a party to the agreement. 7 LARY LAWRENCE, LAWRENCE'S ANDERSON ON THE UNIFORM COMMERCIAL CODE § 4-103:12, at 39 (3d ed. rev. 2000).

Here, any private agreement between Key Bank and Sterling Bank was just that—an agreement between Key Bank and Sterling. It could not affect the right of Seafirst (who was not a party to the agreement) to receive timely

return or notice of dishonor. Nor could it affect Seafirst's obligation to credit the Hubert account.

Key Bank was the payor bank.

*Stop Payment*. Ms. Williams stopped payment on these checks on the same day the payor bank received them.

■ If the payor bank receives a stop-payment order on a check, its duty to pay terminates if the order is received between one hour after the opening of the next banking day following the day the payor bank receives the check and the close of that banking day, plus a reasonable time in which to take appropriate action. RCW 62A.4-303(a)(5).[6] But this provision affects the rights and obligations of the payor bank vis-à-vis its own customer (here, Ms. Williams). RCW 62A.4-214(a); RCW 62A.4-201; RCW 62A.4-402; RCWA 62A.4-201 cmt. 4; 7 LAWRENCE, *supra*, § 4-201:7, at 110. It cannot relieve the payor bank of its midnight deadline liability to the collecting bank.

■ *Fraud*. Seafirst argues that the rules do not obligate a bank to pay a check that is submitted for the purpose of defrauding the payor bank. RCW 62A.4-302(b). Here, however, Hubert is the person seeking enforcement. And nothing in this record suggests that he was a party to the Williams check-kiting scheme. In fact, if anything, he was another victim.

Moreover, there is some question whether a check-kiting scheme falls within the fraud defense. All banks assume a risk by allowing a customer to draw on uncollected funds. 1 BARKLEY CLARK & BARBARA CLARK, THE LAW OF BANK DEPOSITS, COLLECTIONS AND CREDIT CARDS ¶ 9.01, at 9-3 (rev. ed. 2002). Commentators have suggested that the actual presentment of the draft is not a fraudulent presentment as defined in RCW 62A.4-302. After all, the representations on the face of the check are correct. So in the typical interbank dispute when the kite crashes, commentators urge that the loss should be left where the kite crashed—here with Key Bank. CLARK, *supra*, ¶ 9.01, at 9-3.

---

[6] We apologize for the convoluted English but this is the language of the UCC.

That aside, there is no suggestion that Hubert was in any way involved in this check-kiting scheme.

*Notice of Dishonor.* Again, the items must be returned or notice of dishonor must be issued before the midnight deadline. RCW 62A.4-302(a)(1).

■ *Damages.* Finally, Seafirst argues that Hubert can prove no theory of damages under article 4 of the UCC. The possible damages, according to Seafirst, are those chargeable to it as a collecting bank. This means Seafirst is liable for only those amounts which Hubert would have realized but for Seafirst's failure of ordinary care. And, Seafirst continues, these checks were worthless from the outset. Hubert would thus never have realized anything on them. But this argument ignores the strict accountability principle. Key Bank had to pay if it failed to dishonor or return the checks before the midnight deadline. Actual damages are not the test. CLARK, *supra,* ¶ 6.02[1][b], at 6-19.

NEGLIGENCE CLAIMS

The next question is whether Hubert is liable for the loss in negligence. Seafirst contends that Hubert P.C. owed it a duty on three theories: respondeat superior; negligent supervision; and a separate, nondelegable duty on the part of Mr. Hubert to supervise client trust accounts. The court concluded that Hubert P.C. was negligent as a matter of law.

Hubert responds first that Hubert P.C. was not liable for negligent supervision of Ms. Williams because Ms. Williams was not an employee. She had her own company. Second, Hubert contends that Hubert P.C.'s relationship to the bank was that of a customer. A customer owes no duty to its bank to detect check-kiting schemes.

■ The existence of a duty is a question of law. *Mucsi v. Graoch Assocs. Ltd. P'ship No. 12,* 144 Wn.2d 847, 854, 31 P.3d 684 (2001).

■ *Respondeat Superior.* An employer, including a professional services corporation, is liable for the tort of an employee only if the employee was acting within the scope

of his or her employment. *Amend v. Bell*, 89 Wn.2d 124, 127, 570 P.2d 138 (1977).

As a preliminary matter, Seafirst failed to establish that Ms. Williams, an independent contractor, was an employee of Hubert P.C. Seafirst does not contend that the scope of Ms. Williams' employment included kiting checks. Hubert P.C. cannot be held liable in negligence for the criminal conduct of Ms. Williams. *Id*.

 *Negligent Supervision*. An employer has a duty to competently hire and supervise employees. *Haubry v. Snow*, 106 Wn. App. 666, 679, 31 P.3d 1186 (2001). This duty is owed to third parties. And it is independent of the doctrine of respondeat superior. *Scott v. Blanchet High Sch.*, 50 Wn. App. 37, 43, 747 P.2d 1124 (1987) (quoting 53 Am. Jur. 2d *Master and Servant* § 422 (1970)).

Seafirst does not contend that Hubert P.C. negligently hired and supervised Mr. Hubert. Neither does it contend that the corporation is indirectly liable for Mr. Hubert's negligent supervision of Ms. Williams. Rather, Seafirst contends that the corporate entity is liable for Mr. Hubert's negligent supervision of Ms. Williams independently of the negligence of Mr. Hubert himself.

 Seafirst correctly asserts that supervising attorneys are responsible for the negligence of their paralegals. In *Tegman v. Accident & Medical Investigations, Inc.*, several supervising attorneys were held responsible for damages caused by the misconduct of their paralegal. *Tegman v. Accident & Med. Investigations, Inc.*, 107 Wn. App. 868, 30 P.3d 8 (2001), *review granted*, 145 Wn.2d 1034 (2002). The professional services corporation was also found liable on summary judgment that was not appealed. *Id*. at 873. But *Tegman* does not hold that a legal professional services corporation is liable for the losses of third parties absent a showing of negligence by the lawyers. And here, the negligence claim against Mr. Hubert was dismissed.

 *Customer's Duty*. Seafirst suggests, for the first time on appeal and without supporting authority, that Hubert

P.C. owed its bank a duty of care to competently monitor its accounts to detect mistake or fraud. Seafirst did not argue this theory to the trial judge. And as a general rule, which we adhere to here, we will not review claims not raised in the trial court. RAP 2.5(a).

 *Professional Conduct.* Finally, Seafirst contends that the violation of the Rules of Professional Conduct (RPC) is negligence as a matter of law. Violation of the RPC is an ethical violation, but not necessarily the breach of a legal duty of care. And it is the breach of the legal duty that is actionable. *Hizey v. Carpenter*, 119 Wn.2d 251, 265, 830 P.2d 646 (1992). Moreover, that legal duty is owed to the lawyer's client, not a third party. *Trask v. Butler*, 123 Wn.2d 835, 840, 872 P.2d 1080 (1994).

Seafirst had no lawyer-client relationship with either Mr. Hubert or Hubert P.C. Breach of the RPC could not, therefore, provide a basis for a negligence claim by Seafirst.

Seafirst dismissed Mr. Hubert individually. We find no basis in the record or in the argument on appeal upon which the professional corporation could be held liable once the claims against Mr. Hubert personally were dismissed.

We reverse the summary judgment in favor of Seafirst and remand for entry of judgment in favor of Hubert.

BROWN, C.J., and KURTZ, J., concur.

Reconsideration denied April 14, 2003.