PRESENT: Goodwyn, C.J., Mims, Powell, Kelsey, McCullough, and Chafin, JJ., and Koontz, S.J.

SHEREE STAHL

v. Record No. 201515

CAROLE STITT, ET AL.

OPINION BY
JUSTICE TERESA M. CHAFIN
MARCH 3, 2022

FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
F. Patrick Yeatts, Judge

Sheree Stahl contends that the Circuit Court of the City of Lynchburg erroneously concluded that she lacked standing to enforce the "midnight deadline" rule set forth in Section 4-302 of the Uniform Commercial Code (the "UCC"), as adopted by Va. Code § 8.4-302 and W. Va. Code § 46-4-302. For the following reasons, we will affirm the judgment of the circuit court.

I. BACKGROUND

Stahl was the niece of Ivory Markus. In 2012, Markus and her husband moved from Princeton, West Virginia, to a retirement community in Lynchburg, Virginia. Markus' husband died on September 8, 2015. On March 1, 2016, Markus began living with Stahl in Woodbridge, Virginia. Markus received hospice care while she lived in Stahl's home.

Markus held checking accounts at two banks: (1) Branch Banking and Trust Company ("BB&T"), and (2) MCNB Bank and Trust Company ("MCNB"), a bank operating primarily in West Virginia. Stahl was the payable-on-death ("POD") beneficiary of the BB&T account. Shortly after Markus began living with Stahl, Markus attempted to transfer funds from her MCNB account to her BB&T account. Stahl assisted Markus with this transaction.

On March 15, 2016, Stahl made an electronic request for a check transferring the balance of Markus' MCNB account to Markus' BB&T account. On March 18, 2016, MCNB's online

banking system issued a check in the amount of $245,271.25 for "mail-in" deposit into Markus' BB&T account. The check was payable to Markus' BB&T account instead of Markus personally. A branch of BB&T located in Woodbridge, Virginia, received the check on March 21, 2016. BB&T provisionally credited Markus' account with $245,271.25 on the day that it received the check.

On March 22, 2016, the check was electronically presented to MCNB for payment. MCNB decided to dishonor the check and return it to BB&T. MCNB, however, did not return the check before midnight of March 23, 2016. MCNB alleged that it returned the check to the Federal Reserve by first-class mail on March 25, 2016. Markus died intestate the next day, on March 26, 2016.

Before Markus' death, Carole Stitt and Rebecca Mayhew learned of the transaction at issue. Stitt was Markus' sister, and Mayhew was Markus' niece. Mayhew promptly contacted both BB&T and MCNB and alleged that the transaction was fraudulent. After Mayhew informed BB&T that Markus died, BB&T froze Markus' account. BB&T subsequently learned that MCNB claimed that it had returned the check to the Federal Reserve.

Despite these circumstances, BB&T presented the check to MCNB again on April 1, 2016. MCNB dishonored the check and returned it to the Federal Reserve by first-class mail on April 5, 2016. On April 13, 2016, the funds from the check were removed from Markus' BB&T account and recredited to her MCNB account. After qualifying as the administrator of Markus' estate, Stitt obtained the funds from Markus' MCNB account on April 28, 2016.

As the POD beneficiary of the BB&T account, Stahl maintained that she owned the funds that were deposited in the account at the time of Markus' death. Consequently, Stahl claimed that she was entitled to the $245,271.25 that was credited to the BB&T account on March 26,

2

2016. Stahl filed a series of complaints asserting various claims against Stitt, Mayhew, BB&T, and MCNB. All of Stahl's claims were eventually dismissed, however, except for her claim against MCNB.

In her Second Amended Complaint, Stahl alleged that MCNB violated the midnight deadline rule adopted from the UCC. Citing Va. Code § 8.4-302 and W. Va. Code § 46-4-302, Stahl argued that MCNB retained the check beyond the midnight deadline "without paying or returning the item, and without sending notice of dishonor." Stahl maintained that, therefore, MCNB was strictly liable for the payment of the check.

Stahl filed a motion for summary judgment regarding her claim against MCNB. In response, MCNB asserted that Stahl did not have standing to enforce the midnight deadline rule.

On April 18, 2019, the circuit court addressed MCNB's standing argument during a hearing concerning Stahl's summary judgment motion.[1] Relying heavily on the reasoning of *American Title Ins. Co. v. Burke & Herbert Bank & Trust Co.*, 813 F. Supp. 423 (E.D. Va. 1993), *aff'd*, 25 F.3d 1038 (4th Cir. 1994),[2] the circuit court questioned whether Stahl had standing to enforce the midnight deadline rule against MCNB. The circuit court noted that Markus was still alive when the check was presented to MCNB on March 22, 2016, and that Stahl was only a POD beneficiary of the BB&T account on that date. Therefore, the circuit court

---

[1] Judge R. Edwin Burnette, Jr., presided over this hearing.

[2] The United States Court of Appeals for the Fourth Circuit affirmed the district court's decision in an unpublished per curiam opinion. *See American Title Ins. Co. v. Burke & Herbert Bank & Trust Co.*, 1994 WL 224210, at *1 (4th Cir. 1994). While the per curiam opinion briefly addressed the facts of the case, the Fourth Circuit did not expound upon the reasoning offered by the district court. *See id.* Instead, the per curiam opinion expressly adopted the reasoning of the district court and affirmed the judgment on that basis. *See id.*

3

observed that Stahl did not have any vested interest in the check at issue when it was initially presented for payment.

The circuit court denied Stahl's motion for summary judgment against MCNB and invited MCNB to file its own motion for summary judgment based on Stahl's lack of standing. MCNB filed such a motion on May 22, 2019.

On July 1, 2019, Stahl filed a motion to compel MCNB to produce any documents related to the second presentment of the check at issue. Stahl filed a related motion for leave to file a third amended complaint on August 1, 2019. Stahl wished to amend her complaint to include new allegations arising from the second presentment of the check.

Stahl argued that the second presentment of the check established an additional ground for imposing strict liability on MCNB. Stahl asserted that she was the "holder" of the BB&T account when the check was presented to MCNB for the second time on April 1, 2016, after Markus' death. Stahl argued that, therefore, she had standing to enforce the midnight deadline rule against MCNB following the second untimely return of the check on April 5, 2016.

On July 23, 2020, the circuit court held a hearing regarding MCNB's motion for summary judgment and Stahl's pending motions.[3] After hearing limited evidence and argument from the parties, the circuit court took the matter under advisement.

On August 17, 2020, the circuit court issued an opinion letter regarding the pending motions. The circuit court granted MCNB's motion for summary judgment. Relying on the reasoning set forth in *American Title*, the circuit court concluded that Stahl lacked standing to pursue her claim against MCNB.

---

[3] Due to Judge Burnette's retirement, Judge F. Patrick Yeatts presided over this hearing.

The circuit court determined that Stahl did not have any right to rely on the prompt payment of the check at issue. While the circuit court acknowledged that the original parties to the transaction could have relied on the prompt payment of the check, the circuit court found that Stahl was a "crucial step removed from the transaction." The circuit court explained that Stahl's "eventual status as a customer taking over the BB&T account . . . [did] not change Stahl's lack of reliance on the midnight-deadline rule at the time the check was presented." Furthermore, the circuit court observed that Stahl "could not have reasonably relied on the funds in a frozen BB&T account during the second presentment of the dishonored check."

For these reasons, the circuit court concluded that Stahl did not have standing to enforce the midnight deadline rule. In light of this conclusion, the circuit court determined that Stahl's pending motions were moot. On September 21, 2020, the circuit court entered a final order that granted MCNB's motion for summary judgment, denied Stahl's pending motions, and dismissed Stahl's complaint. This appeal followed.

## II. ANALYSIS

On appeal, Stahl argues that the circuit court erred when it granted MCNB's motion for summary judgment based on her alleged lack of standing to enforce the midnight deadline rule. We disagree with Stahl.

In an appeal from a circuit court's decision to grant or deny summary judgment, we review the application of the law to undisputed facts de novo. *Deutsche Bank Nat'l Trust Co. v. Arrington*, 290 Va. 109, 114 (2015). Furthermore, we review questions of statutory interpretation de novo. *Id.*

"Summary judgment may not be entered if any material fact is genuinely in dispute." Rule 3:20. "Under well-settled principles, we review the record applying the same standard a

5

trial court must adopt in reviewing a motion for summary judgment, accepting as true those inferences from the facts that are most favorable to the nonmoving party, unless the inferences are forced, strained, or contrary to reason." *Fultz v. Delhaize Am., Inc.*, 278 Va. 84, 88 (2009).

Both Virginia and West Virginia have adopted nearly identical versions of Section 4-302 of the UCC, the provision establishing the midnight deadline rule. In pertinent part, Va. Code § 8.4-302 states:

> If an item is presented and received by a payor bank, the bank is accountable for the amount [of] . . . a demand item, other than a documentary draft, whether properly payable or not if the bank, in any case where it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, regardless of whether it is also the depositary bank, *does not pay or return the item or send notice of dishonor until after its midnight deadline.*

Va. Code § 8.4-302(a)(1) (emphasis added). Similarly, W. Va. Code § 46-4-302 states:

> If an item is presented to and received by a payor bank, the bank is accountable for the amount of . . . [a] demand item, other than a documentary draft, whether properly payable or not, if the bank, in any case in which it is not also the depositary bank, retains the item beyond midnight of the banking day of receipt without settling for it or, whether or not it is also the depositary bank, *does not pay or return the item or send notice of dishonor until after its midnight deadline.*

W. Va. Code § 46-4-302(a)(1) (emphasis added).

Likewise, Virginia and West Virginia have defined the term "midnight deadline" in an identical manner. Under the pertinent Virginia and West Virginia statutes, the "'[m]idnight deadline' with respect to a bank is midnight on its next banking day following the banking day on which it receives the relevant item or notice or from which the time for taking action commences to run, whichever is later[.]" Va. Code § 8.4-104(a)(10); W. Va. Code § 46-4-104(a)(10).

6

As the branch of MCNB that processed the check at issue was located in West Virginia, the pertinent West Virginia statutes apply in this case.

> The liability of a bank for action or nonaction with respect to an item handled by it for purposes of presentment, payment or collection is governed by the law of the place where the bank is located. In the case of action or nonaction by or at a branch or separate office of a bank, its liability is governed by the law of the place where the branch or separate office is located.

Va. Code § 8.4-102(b); *see also* W. Va. Code § 46-4-102(b) (setting forth an identical provision). Nevertheless, our analysis in this case would be the same if we applied Virginia law. Given the similarity of the applicable Virginia and West Virginia statutes, we would reach an identical conclusion applying either Virginia or West Virginia law.

The midnight deadline rule imposes strict liability on a payor bank that fails to meet the midnight deadline requirement. *See, e.g.*, Va. Code § 8.4-302; W. Va. Code § 46-4-302; *American Title*, 813 F. Supp. at 426. The purpose of the midnight deadline rule is "to satisfy the 'need for finality and certainty in business transactions.'" *American Title*, 813 F. Supp. at 426 (quoting *Citizens Fidelity Bank & Trust Co. v. Southwest Bank & Trust Co.*, 472 N.W.2d 198, 202 (Neb. 1991)). "Therefore, liability for the face amount of the check is imposed without regard to whether any damages have been sustained as a result of the payor bank's failure to make a timely return." *Id.*

In the present case, Stahl contends that MCNB violated the midnight deadline rule when it failed to promptly return or dishonor the check at issue following both the first and second presentments. The circuit court, however, did not reach the merits of Stahl's substantive argument because it concluded that Stahl lacked standing to enforce the midnight deadline rule.

Very few courts have addressed standing in the context of the midnight deadline rule. Nonetheless, *American Title* is generally viewed as the leading authority concerning this

7

particular issue. We find that *American Title* is well-reasoned, persuasive, and applicable to the present case.

In *American Title*, an agent of the plaintiff embezzled funds that he received during real estate closings. *See id.* at 425. The agent's embezzlement caused a trust account to become overdrawn. *See id.* The defendant bank subsequently returned three checks written by the agent because the trust account held insufficient funds. *See id.* The bank, however, did not return the checks until after the midnight deadline had passed. *See id.*

The plaintiff had to reimburse the payees of the checks under the terms of certain Closing Protection Letters and, eventually, the reimbursed payees assigned their rights to payment under the checks to the plaintiff. *See id.* at 425-26. The plaintiff then attempted to enforce the midnight deadline rule against the defendant bank. *See id.* at 426. Citing Va. Code § 8.4-302, the plaintiff argued that the defendant bank was strictly liable for the payment of the checks. *See id.* In response, the defendant bank asserted that the plaintiff lacked standing to enforce Va. Code § 8.4-302. *See id.* at 425.

The district court acknowledged that the "scope of standing to sue under [Va. Code] § 8.4-302 is not clearly delineated in the Code provisions." *Id.* at 427. Nevertheless, the district court observed that the scope of standing in this context is "circumscribed by the practical and economic realities associated with the check collection and payment process." *Id.*

The district court concluded that Va. Code § 8.4-302 confers standing upon a "limited class comprised of those involved in the collection and payment of the check at issue who may be directly harmed (but are not necessarily actually harmed) by the failure of the payor bank to adhere to the . . . midnight deadline." *Id.* at 428. The district court emphasized that "it is the

8

potential reliance on payor bank action that arises once a check is actually presented that provides the basis for standing to sue under [Va. Code] § [8.4]-302." *Id.*

Applying these principles, the district court held that the plaintiff lacked standing to enforce the midnight deadline rule. *Id.* Significantly, the district court concluded that the plaintiff could not have relied on the prompt payment of the checks at issue. *Id.* at 429. The district court noted that the plaintiff had "no vested interest" in the timely payment or return of the checks "[a]t the time of their presentment by the payees." *Id.* Furthermore, the district court observed that the plaintiff acquired the checks "well after their untimely return by [the defendant bank] and with full knowledge that they had been dishonored for insufficient funds." *Id.* The district court explained that when a party "becomes a holder, transferee and assignee of checks after their untimely return by a payor bank, that party has no standing to bring a cause of action for the bank's violation of [Va. Code] § [8.4]-302." *Id.*

Based on the logic of *American Title*, we conclude that the circuit court correctly determined that Stahl lacked standing to enforce the midnight deadline rule against MCNB. Although Stahl eventually became the owner of the BB&T account, the undisputed facts of this case established that Stahl could not have relied on the prompt payment of the check as a matter of law. *See id.* at 428-29.

Stahl was too remote from the transaction at issue to have standing to enforce the midnight deadline rule following the first presentment of the check. The transaction was essentially designed to transfer funds between Markus' accounts. Markus was the party who presented the check for payment. Thus, Markus could have relied on the prompt payment of the check and the resulting availability of the funds at issue.

9

In contrast, Stahl was only a POD beneficiary of the BB&T account when the check was initially presented for payment. Accordingly, Stahl had at most a contingent interest in the funds at issue. Markus could have removed Stahl as the POD beneficiary of the BB&T account after the check was presented for payment. In such an event, Stahl would have had *no* interest in the BB&T account or the funds resulting from the check. Under these circumstances, Stahl could not have relied on the prompt payment of the check or the availability of the funds at issue following the first presentment.

Stahl notes that the check at issue was presented to MCNB for a second time on April 1, 2016, after Stahl acquired ownership of the BB&T account and the check on March 26, 2016. Therefore, Stahl argues that she had standing to enforce the midnight deadline rule following the second presentment of the check. Stahl's eventual ownership of the BB&T account, however, does not cure her lack of standing.

The particular facts of this case established that Stahl could not have relied on the prompt payment of the check following the second presentment. In light of the specific circumstances, it was unlikely that MCNB would promptly honor the check. Markus' relatives had informed both MCNB and BB&T that the underlying transaction was fraudulent, and they had taken steps to prevent the funds at issue from being transferred to the BB&T account. Moreover, MCNB had already refused to pay the check once following the initial presentment.[4]

Furthermore, Markus, the holder of both the BB&T and MCNB accounts who initiated the transaction at issue, died on March 26, 2016, before the check was re-presented to MCNB on April 1, 2016. BB&T froze Markus' account on the day of her death. Thus, the funds in the

---

[4] We acknowledge that Stahl disputes the date that MCNB attempted to return the check to the Federal Reserve. We can infer, however, that MCNB had not paid the check before April 1, 2016. Otherwise, there would have been no need for the second presentment.

BB&T account were unavailable to Stahl. As a practical matter, Stahl could not have relied on the immediate availability of any funds that may have ultimately been deposited into the BB&T account following the second presentment.

As Stahl could not have relied on the prompt payment of the check at issue, she lacked standing to enforce the midnight deadline rule. Therefore, the circuit court did not err when it granted MCNB's motion for summary judgment and denied Stahl's motions related to the second presentment.

## III. CONCLUSION

For the reasons stated, we will affirm the judgment of the circuit court.

*Affirmed.*

11